## DELABIGARRE v. SECOND MUNICIPALITY OF NEW ORLEANS.

The true cause of a contract may be shown by any legal evidence, oral or written, and the evidence adduced for that purpose never can be considered as contradicting the act. C. C. 1888, 1894.

Corporations will not be held responsible for the errors of their agents in pleading, or in defending suits.

To support the exception *rei judicatæ* the issue in the two actions, as well as the parties, must be the same. Successors, or *ayans-cause* of the parties to the original suit, are considered as having been parties themselves, where their titles have been acquired since the institution of the action in which the original judgment was rendered; *aliter*, if acquired before.

A vendor does not represent the purchaser, in relation to real rights alienated by him. He has divested himself of them, and cannot dispose of, nor compromise, them in any way to the prejudice of the purchaser, by whom, or against whom, all actions affecting them must be brought. The purchaser is not bound to intervene though he may have knowledge of the proceeding.

A compromise may be made under the form of an onerous donation; and, in such a case, it will be subject only to the rules applicable to commutative contracts.

Where an executor compromises a claim of the succession without having been authorized by the court, the heirs alone can take advantage of the omission; and it is incumbent on them to do so when they take the seizin of the succession from the exeutor. *Per Curiam :* They cannot be [permitted to receive from him all the property which the compromise had secured to them, and to claim more afterwards on the ground that he had no authority to make it.

After twenty years the authority of an agent will be presumed.

Where a ratification is not express, facts must be established from which it necessarily results.

The sovereign alone has the right to change the destination of public places.

APPEAL from the Fifth District Court of New Orleans. *Buchanan, J.* The facts material to a correct understanding of the decision in this case are stated in the opinion *infrâ*.

*R. N.*, and *A. N. Ogden*, for the plaintiff. I. The sale from *John Gravier* to *Peter Delabigarre*, in 1804, of two-thirds of the batture in front of the faubourg St. Mary, embracing the *locus in quo*, is a valid title to the plaintiff, as the daughter and heir of *Delabigarre*, to the one-fourth of the batture she now seeks to recover. II. The title of *John Gravier* cannot be controverted by the defendants, because it has, by virtue of the final judgment rendered in his favor against the corporation of New Orleans, the authority of the thing adjudged, in favor of the purchasers from *John Gravier*, as well as in favor of himself and his heirs. III. The defendants in this suit, having set up title to the property under the plaintiff's ancestor, are not permitted to attack that title. IV. The title set up by defendants in their answer, being a donation of the property in 1820, executed in their favor by the executor of *Delabigarre*, and which it is conceded he had no authority to make as executor, the act was in regard to the heirs of *Delabigarre* an absolute nullity, and not susceptible of being rendered valid by ratification or voluntary execution on the part of the heirs, the law expressly requiring that, as a donation, it should be executed by the heirs them-

selves in legal form. V. After pleading title under that act as a donation, the <span style="float:right">Delabigarre</span>
defendants cannot be permitted to withdraw the admission, and prove that the <span style="float:right">v.</span>
act was a compromise; nor can they be permitted to contradict the act itself, <span style="float:right">Second Muni-</span>
and show, by parol evidence or by presumptions, that it was a different act from <span style="float:right">cipality.</span>
what it purports to be. VI. The intrinsic evidence furnished by the act itself,
as well as the established facts in regard to the previous litigation concerning
the batture between *John Gravier* and the corporation, and the final judgment
against them, prove that the act was not a compromise or transaction. VII. If
the act was a compromise, the executor was equally without authority to make
it, and there is no evidence of any ratification or voluntary execution of it by
the heirs of *Delabigarre*: and, as a compromise, in view of the final judgment
which had been rendered against the corporation, it was in substance giving
away the property without any consideration. VIII. The act relied on by the
defendants is essentially a donation *inter vivos*, and irrevocable, because it pur-
ports to transfer, and does transfer, the absolute title to the property; and it is
not therefore a dedication to public use, which in its nature does not transfer
the title to the soil, but only the right to its use as long as required by the
public utility—" the naked fee always remaining in the owner of the soil." IX.
If viewed as a dedication to public use, it is still conceded that the executor
had no right to make it. The act even then was null, without the signature of
the heirs of *Delabigarre*, and, being in the form of a donation, could not be
ratified; but in whatever light it be viewed, whether susceptible or not of being
ratified and confirmed, there is no evidence that it was ever confirmed by the
heirs of *Delabigarre*, nor are any subsequent acts shown on their part from
which their assent to it can be even inferred as probable, much less he said to
have necessarily resulted. X. As to the dedication, independently of the act
in question, resulting from the use which the public have had of the batture,
no length of time could give such a right, unless the assent of the owner of the
soil was shown, and that assent could not be inferred when the corporation
claimed and exercised, under the law, the right of public use, independently of
the will of the owner. XI. The municipality are not invested by law with an
arbitrary discretion to give or withhold their consent to the front proprietors, to
reclaim the batture belonging to them outside of the levée, and when the public
interests no longer require the use of the whole; they may be compelled to
surrender to the front proprietors all that portion of it which is no longer
needed for public purposes. XII. The evidence furnished by the resolutions
of the council of the municipality, and the plans caused by them to be made,
laying the batture out into streets and squares for the purpose of being sold,
entitle the plaintiff to a judgment for the possession as well as the title.

*Roselius*, for the appellants, contended: I. That the act of 1820 was a com-
promise, and not a donation *inter vivos*. The nature of a contract does not de-
pend on the name which the parties, through ignorance or design, may have
given to it. "A donation *inter vivos*" says the Code, art. 1454, "is an act by
which the donor divests himself at present and irrevocably of the thing given,
in favor of the donee who accepts it." See also Pothier, Donations entre-vifs,
s. 3, art. 1. Merlin, Rep. *verbo* Donation, sec. 1, § 1. Here the mayor,
aldermen, and inhabitants of New Orleans are represented in the contract as
the nominal donees; but no title to, or ownership of, any part of the batture
was transferred to them—it is converted into a *locus publicus*. If the contract
were a donation, the public, and not the city, would be the donees. No par-
ticular form is required for a dedication of property to public use. See 6 Pe-
ters, 431, 498. 10 Ib. 662. 6 Vermont R. 355. 7 Harr. part 2, p. 135. 18
La. 286. II. The plaintiff has ratified the act of *Lafon*, as executor, in making
the dedication. 11 La. 286. 7 Mart. N. S. 143. Dig. l. 14, tit. 6, sec. 16,
Merlin, Qu. de Droit, *verbo* Compte-Courant, sec. 13. Paillet, on article
1985 of Code Napoléon. III. It is immaterial to enquire whether *Oddie*
had authority to represent the plaintiff in the act of 1820, she having
since voluntarily executed that contract. See Code, art. 2252. Code Nap.
1338. Merlin, Qu. de Droit, *verbo* Mineur, s. 3. Dig. l. 27, tit. 9, s. 10, 14.
Voet. Com. ad Pand. vol. 2, p. 208. Gluck's Comm. on the Pandects, vol. 33,
p. 72, *et seq.*, s. 1389. Duranton, vol. 13, p. 295, no. 280. Toullier, vol. 5,
p. 203, no. 189. The argument that the omission of *Oddie* to sign the act is
fatal, because it creates a defect of form, rests on the erroneous notion that the
contract is a donation. IV. One, in whose name a contract has been made by a
person who pretended to be his agent but who was not, must repudiate the
contract as soon as he is informed of it, or he will be considered as having rati-

DELABIGARRE
v.
SECOND MUNI-
CIPALITY.

fied it. Dig. 1. 14, tit. 6, ¶ 16. 7 Mart. N. S. 140. Duranton, vol. 13 nos. 264, 265. Pothier, Mandat, nos. 29. 99. V. The fact of the public having been in undisturbed possession of the *locus in quo*, without opposition, for more than twenty-five years, is of itself sufficient evidence of a dedication to public use. 6 Peters, 504, 512. Best, on Presumptions of Law and Fact, p. 134, 137. Shelford's Real Property Acts, p. 55. VI. The claim set up to title to the property, by the resolutions of the Council of the Second Municipality proposing to sell it, cannot impair the rights of the public to it as a *locus publicus.* See 6 Peters, 507. VII. The plaintiff has shown no title to the strip of batture described in her petition, even on the hypothesis that she is not bound by the dedication.

*H. A. Bullard,* on the same side. I. The act passed before *Lavergne,* in 1820, in form of a donation, but with onerous conditions on the part of the donors, in the nature of a compromise between the actual possessors of the batture and the city of New Orleans, is essentially a dedication to the public use of the property which formed the object of the contract. II. Even considered as a mere donation, it has all the solemnity of form required by law, having been passed before a notary public and two witnesses; and the objection that it is null, because *Lafon* was not authorized to represent the heirs of *Delabigarre,* does not go to the *form* of the act, but to the authority of the person assuming to represent the plaintiff. The objection, in effect, is, that the act wants the consent of the plaintiff. If the objection were to the solemnity of the act, as, for example, that, being a donation, it was not passed before a notary and two witnesses, I admit that it would be so radically null that it could not be ratified. In such a case the consent would not be wanting, but that consent would not be given in the form required by law for the validity of a donation. A testament without the solemnities regarded by law, is null for want of form; a testament made by an insane person, in all the rigor of legal solemnities, is void for want of capacity to consent, or make a testament. When the nullity is a radical one, inherent in the nature of the contract itself as illegal and forbidden by law, or when it is not made in the form required by law, it cannot be made good by ratification; but the mere absence of an original consent, by a person authorized to give it, may be supplied by his subsequent consent. There is no evidence that the plaintiff had, at the date of the act of 1820, accepted the succession of her father. The estate was represented by *Lafon.* as executor, and he signed the act in that capacity. If the heirs, when they entered upon the estate, had contested the authority of *Lafon* to bind them, it would have been incumbent on us to show his power as executor, derived from the will; but when the heirs expressly recognize his acts, they admit his original authority. They accept the estate, such as it was after *Lafon* had closed his administration. III. Plaintiff has executed all the stipulations and engagements contained in the act of pretended donation, by leaving the whole property open to public use, without opposition, for more than twenty-five years, and by providing for the payment of the sums agreed upon for building a market-house, and has thereby ratified and approved the acts of *Lafon,* and is estopped from denying his authority. IV. But it is contended by the plaintiff that, her property is no longer required for the use of the public, and that she is entitled to recover it and convert it to her own use; and, as evidence of the fact, she relies on the resolutions of the Council of the Second Municipality. Admitting that the accumulation of the batture beyond the new levée has become too extensive for convenient public use, it by no means follows that plaintiff is entitled to recover. On the contrary, the whole being an accretion to the levée, which is declared by the act to be a *locus publicus,* partakes of the character of the principal. The levée is irrevocably dedicated to public use; the grantor retained no species of interest or title to or in it, and the idea that the plaintiff and her associates retained what they call the *fee,* and gave only the *use,* is inconsistent with the whole tenor of the act itself. The sovereign alone has a right to authorize a *part to be applied* to other purposes, when no longer required for public use. The act contains no resolutory condition, and no right of reversion. All places dedicated to public use are placed *extra commercium;* they cannot be alienated, nor appropriated to private uses. *De Armas* v. *Mayor,* &c., 5 La. 132. The whole of the alluvion in front of New Levée street, has been formed since 1820. The ground on which the new levée stands, having been devoted to public use, without reservation, and constituting as it did, and does to this day, the bank of the river, the

new formation became a part of the levée, and constituted a *locus publicus*
equally with the levée itself.

The judgment of the court was pronounced by

ROST, J.   This is a petitory action.   The plaintiff, as heir and sole repre-
sentative of *Pierre Delabigarre*, claims the undivided fourth of a portion of the
alluvion in front of faubourg St. Mary, which was a source of fierce litigation,
sometimes threatening the public peace, from the change of government to the
date of the contract entered into, between the parties in possession of it at the
time and the city of New Orleans, on the 20th of September, 1820.   She
avers that her father acquired his title, on the 20th of March, 1804, from *Jean
Gravier*, who held under a regular chain of conveyances from the original
grantee ; and that, by subsequent arrangements with the late *Edward Living-
ston*, who owned the other three undived fourths, the land now claimed has
been ever since held in common between them.   She finally alleges that Mu-
nicipality No. Two is in possession, and claims title.   She prays that the
heirs of *Livingston* be made parties to these proceedings, that Municipality ·
No. Two be cited, and that she may have judgment for the undivided fourth
part of the batture claimed.   She farther prays for a partition against the heirs
of *Livingston*, for a writ of possession, and for general relief.

The widow and heir of *Livingston* answered that, they decline taking any
part in the litigation now pending between the plaintiff and defendants, and
protest against having their rights precluded by this litigation ; but they say that
if the court should order a partition to take place as prayed for by the plaintiff,
they have no objection that said partition, in that event, should be made on the
basis and in the proportions alleged by the plaintiff to be the true basis for such
partition.

The other defendants filed a general denial, and opposed to the plaintiff the
contract of the 20th of September, 1820, signed by *B. Lafon*, executor of *Pierre
Delabigarre*, by which it is alleged that the entire batture in front of faubourg
St. Mary was given, ceded, and conveyed to the city of New Orleans.   In a
supplemental answer, the defendants set up an exclusive title in themselves to
all the batture.

The Third Municipality here intervened opposing the pretensions of all par-
ties, for the purpose of preserving its legal rights under the contract of 1820,
and the act of division of 1836.

The plaintiff afterwards filed a supplemental petition, alleging the nullity of
the contract of 1820, on the ground of want of authority in the executor to
make it.   This petition farther alleges that the original petition erroneously
states that the portion of the batture therein described was, at the time of the
death of her father, held in common and undivided between him and *Edward
Livingston*, and that in fact the said *Livingston* only acquired his title on the
3d of May, 1819, from the heirs of *Bertrand Gravier*.   The plaintiff farther
alleges that, in 1807 or 1808, the title under which she claims was finally ad-
judicated upon in favor of *Jean Gravier* by the Superior Court of the Territo-
ry of Orleans, in a suit in which the said *Jean Gravier* was plaintiff, and the
Mayor, Aldermen, &c. of the city of New Orleans were defendants ; which
judgment it is alleged remains in full force, and cannot now be questioned by
any of the Municipalities.

In their answer to the supplemental petition, the defendants generally deny
the allegations therein contained, and further answering aver that the act re-
ferred to in the supplemental petition, although called a donation, was in reality

DELABIGARRE
*v.*
SECOND MUNI-
CIPALITY.

DELABIGARRE
v.
SECOND MUNI-
CIPALITY.

an act of compromise, entered into between the riparian proprietors and the corporation of New Orleans, for the purpose of settling the conflicting claims to the batture or alluvion, set up by the parties respectively. That said compromise is binding on the plaintiff, having been frequently recognized and ratified by her since its date; that the piece of ground claimed in the petition is a public place, over which the respondents have the right of administration.

On these issues, the parties went to trial. There was a judgment in favor of the plaintiff on the question of title, and the defendants took a devolutive appeal. A rule was subsequently taken by the plaintiff upon the defendants to show cause why she should not immediately be put in possession of her portion of the batture, which according to the plan made by the surveyor of the Municipality, and the unanimous opinion of the City Council as expressed in one of their ordinances, is no longer wanted for public purposes. This rule was discharged, and the plaintiff appealed.

A great portion of the argument of the counsel on both sides, has been directed to the investigation of the nature of the contract of the 20th of September, 1820; the plaintiff insisting that it was in fact, what it purports to be, a pure and simple donation *inter vivos*, null for want of form as well as for want of authority in *Barthélemy Lafon*, and not susseptible of ratification; the defendants maintaining that it was a final compromise of all the difficulties that had existed till then in relation to the batture, which the executor may have been judicially authorized to make before the acceptance of the succession by the heirs, and which, if he was not so authorized, the plaintiff has since voluntarily executed, and otherwise ratified in various ways.

It is necessary to a proper understanding of this act to state the principal clauses which it contains. The parties of the first part, as actual possessors of the batture, to favor the public, as they allege, in the use of the banks of the river adjoining the batture, and to facilitate the communication of the streets which should extend to it, make an irrevocable donation *inter vivos* to the city of New Orleans, represented by the Mayor, acting on that occasion under the special authorization given to him by the City Council, a copy of which was annexed to the act. The donation includes: 1st. All that portion of the alluvion outside of the line of the new levée previously established. 2d. The new levée itself, and the soil upon which it was erected, in the condition in which the whole would be found after the levée had been repaired, augmented, and a palisade made in front of it by the donors. 3d. The soil necessary for the prolongation of all the streets of the faubourg to the new levée. 4th. So much soil as was necessary to give to Tchoupitoulas street, a breadth of sixty feet through faubourg St. Mary.

This donation was made on the express condition, without which it would not have taken place, that all the lands it conveys shall remain *ultra commercium;* that no buildings shall ever be erected upon them; and that they shall not be applied to any other public uses but those to which they are naturally destined. The act goes on to say, that, in consideration of the donation, and of *the advantages which may result therefrom to all parties*, the donors farther bind themselves towards the city: 1st. To repair and increase the levée mentioned in the act, so as to make it sixty feet at top, and to place palisades in front of it. 2d. To make and fill up at their own expense, all the streets between Tchoupitoulas street and the new levée, and to make platforms at the ends next to the river. 3d. To destroy at their own expense all the buildings then existing on

the batture, and to remove the materials within a delay of thirty days. 4th. To construct at their own expense the buildings necessary for a public market to be erected in faubourg St. Mary, for the erection of which they tax themselves $10 for every front foot of land they possess in the rear of the new levée, and give their notes secured by mortgage to the corporation for their respective shares. The corporation receive the notes, and, in case the amount be more than sufficient to erect the St. Mary's market, they bind themselves to apply the residue in the erection of another market house in faubourg Marigny. The front of the lots belonging to the legal representatives of *Pierre Delabigarre*, is stated to be ninety-four feet, and *Barthélemy Lafon*, as executor, gives his notes at one and two years for $940, according to the terms of the contract.

Nemo facile presumitur donare, is a sound rule in the interpretation of contracts, and before parties, who had been at open war with the city authorities for fifteen years, can be considered as having gratuiously come forward, made a donation to it from pure considerations of love and affection, and imposed heavy charges and contributions upon themselves as a consideration for their liberality, courts of justice will pause and try to discover whether this was the real cause; for a contract is not the less valid, though the cause be not expressed, and if the cause expressed should be one that does not exist, yet the contract cannot be invalidated, if the party can show the existence of a true and sufficient consideration. C. C. 1888, 1894. It is the necessary consequence of those provisions of law, that the true cause may be shown by any legal evidence, oral or written, and that the evidence adduced for that purpose never can be considered as contradicting the act.

The judge of the first instance held the real cause to be a concession of right to power, an abandonment of a part of the property by the donors, for the purpose of being permitted to enjoy the remainder. The plaintiff's counsel have relieved the legislation of those times from that imputation. They have shown that, in 1813, the legislature had provided the mode in which levées might be advanced, when the alluvions in front of them became susceptible of private ownership, and they have referred us to decisions of the late Supreme Court made under that law, in which it was held that the discretion, vested in police juries and city councils to determine when levées should be advanced, was a sound discretion, into the exercise of which courts of justice might enquire. In the case of *Henderson et al. v. The Mayor of New Orleans et al.*, in which a similar question was presented, the court held that, if the jury decided that the levée should be advanced, the city authorities could not refuse the permission, because the owner would not surrender part of the property to the public, or burthen it with servitudes to which other lands are not subject. 5 La. 420. Taking this to have been the law in 1820, the donors might at any time have invoked its protection; and the powers of the city government could not have been arbitrarily exercised to their detriment. We must, therefore, ascertain whether, as alleged by the defendants' counsel, there were at the time dangers of eviction, troubles, or disturbances, from which the contract of 1820 relieved the parties in possession.

It is said, on behalf of the plaintiff, that there was not, because the judgment in *Gravier's* case formed *res judicata* between the plaintiff and the defendants. One of the essential requisites to maintain the exception *rei judicatæ* is, *ut sit cadem causâ petendi*. The city, in *Gravier's* case, did not set up title to the batture, but claimed it exclusively as a *locus publicus*, under a dedication by *Gravier*, and the use of the public ever since the establishment of

faubourg St. Mary. The plea now made presupposes the issue to be the same in this suit. It waives, therefore, the exception in the brief, that the defendants, having set up title in themselves, are bound by that plea, and cannot change the nature of their defence. In conformity with the views expressed in the case of *Millaudon v. The First Municipality of New Orleans*, 1 Annual Rep. 215, we would not, in any case of which we have the control, be disposed to hold the corporators responsible for the errors of their agents in pleading or in defending suits; but here the very ground assumed by the plaintiff waives an informality which might as well perhaps not have been alleged, as the plaintiff herself had committed errors in her pleadings which she rectified in the supplemental petition.

Another essential condition to maintain the exception of the thing adjudged is that, the parties be the same in both suits. Successors to, or *ayans cause* of, the parties in the original suit are considered in law as having been parties themselves, provided always that they have acquired their title after the institution of the suit in which the original judgment was rendered. If the title was acquired before, the exception *rei judicatæ* will not avail. Pothier, Oblig. nos. 901–904.

The vendor does not represent the purchaser in relation to the real rights alienated. He has divested himself of them, and cannot dispose of them, nor compromit them, in any manner to the prejudice of the purchaser, by whom, or against whom, all actions affecting them must be brought. The purchaser is not bound to intervene, although he may have knowledge of the proceedings. Merlin, Quest. de Droit, *verbo* Chose Jugée, § 2.

*Gravier* in this case had parted with his title to *Delabigarre* three years before the institution of the suit, and no privity having been shown between them in the suit, *Gravier* was without capacity to stand in judgment. The concealment of the title of *Delabigarre* was a fraud which could neither benefit nor injure him. Moreover, only a small portion of the land which *Gravier* had sold belonged to him; the remainder was afterwards adjudged by a decree of court to the foreign heirs of *Bertram Gravier*, from whom it was purchased by *Mr. Livingston*, in 1819. Nobody will pretend that the judgment formed the thing adjudged in favor of those heirs; and accordingly we find that, after the judgment had been final ten years, they sold without warranty of any kind to *Mr. Livingston*, who acknowledged in the deed that he was fully aware of the dangers of eviction which existed, and that he purchased at his peril and risk. He had the management of the interests of *Delabigarre*, and seems to have treated them precisely as his own. He was fully aware that, in relation to both, the question of title remained open; and if, after the organization of the State government, a new suit had been instituted to test its validity, we are not prepared to say that, under the principles regulating dedications to public use as they are now understood, the evidence in *Gravier's* case would not have authorized a judgment in favor of the public.

Again, the main question of fact upon which the case of *Gravier* turned was that, at the time of the establishment of faubourg St. Mary a batture susceptible of private ownership existed on the whole line of the levée. Now, in 1819, just before *Mr. Livingston's* purchase, it was held by the late Supreme Court in the case of *Morgan v. Livingston*, that there was no batture susceptible of private ownership at that time in front of a considerable portion of the levée. Whoever peruses the testimony in that case will find it difficult not to give it faith. If that testimony was true, that in *Gravier's* case was false; and

had the judgment been rendered between proper parties, the city had tweny <span style="float:right">Delabigarre</span>
years, under the laws then in force, to set it aside on that ground, by an ac- <span style="float:right">v.<br>Second Muni-</span>
tion of nullity.   Part. 3, tit. 26, laws 1, 2. <span style="float:right">cipality.</span>

   These were the dangers of eviction, troubles, and disturbances to which *Mr.
Livingston* had reference in his purchase from the heirs of *Bertrand Gravier*,
and which induced him to acknowledge, in 1819, that his title was defective,
and to cancel on that ground the sale of two batture lots made by him the year
previous to *Vincent Nolté*.  ·He must have been deeply impressed with the ne-
cessity of making such a transaction in relation to the whole matter, as the city
would accept and the legislature ratify ; for, wherever the public is concerned,
the State is not without interest.   In order to succeed, it was necessary not to
expose the weakness of the title ; hence the great anxiety of *Mr. Livingston*
to abandon to the city all beyond a certain line, provided they would accept it
in the form of a donation ; hence all those bland entreaties for peace and good
neighborhood which, after years of perseverance, finally accomplished his ob-
ject.   The acceptance by the corporation of a portion of the batture from the
possessors, as a gift, virtually acknowledged their title to the remainder, and
prevented the law-suits which they feared.   It was unquestionably the real
cause of the contract, and as the contract itself was such as to satisfy in a great
measure the wants and wishes of the city, it became the apparent interest of
all parties to have it recognized by the legislature.   It was represented to that
branch of the government as a final compromise, ratified by them as such,
and kept in full force after the division of the city, by an express provi-
sion of the act of 1836.   This ratification has rendered the title of the
possessors to the portion they retained perfect; and the policy of the at-
tempt now made to show that the act was not a compromise, which if
successful would do away with it and reinstate the public in its original
rights to the whole batture, is extremely doubtful.   Prescription does not
run against public places and things out of commerce.

   The contract of 1820 was a compromise made under the form of an
onerous donation, and subject only to the rules applicable to commutative
contracts.   C. C. 1513.   It is no more a real donation than an act would
be by which one of the parties made an irrevocable donation *inter vivos* of
an immovable to the other party, who, in return, made to him a similar
donation of the price.   It will not be contended that a contract of that
kind could be avoided by the subsequent birth of children to the donor, nor
on account of the ingratitude of the donee.   Compromises may assume any
form,and simple obligations *to do* or *to give* may be shown, by other evidence, to
be the consideration of them.   Troplong, Transactions, no. 34.

   This compromise was one entire contract, the conditions of which had been
prescribed by a resolution of the City Council annexed to it; and all the obliga-
tions it imposed on the possessors of the batture were the consideration of the
implied recognition of their title to the portion retained.   It contained stipula-
tions not unlike those familiar dispositions of property, by which the naked
property is given to one and the usufruct to another.   No right of reversion
was stipulated under any contingency, and, as long as the compromise stands,
the donors cannot resume the title.

   The counsel for the plaintiff contend that, admitting the contract of 1820 to
be a compromise, it was not signed by the heirs of *Delabigarre*, and his exec-
utor had no authority to make it.   It is not shown that the heirs of *Delabigarre*
had accepted his succession at the time.   That succession was then under the

exclusive administration of the executor, and he might, on a proper showing, have been authorized by the court to compromise. Whether he obtained the authorization does not appear. If he did not, the heirs of *Delabigarre* alone could take advantage of the omission, and it was incumbent upon them to have done so when they took the seizin of the succession from the executor. They cannot be permitted to receive from him all the property which the compromise had secured to them, and to claim more afterwards on the ground that he had no authority to make it.

Within a few weeks of the date of the act, steps were taken to set apart five batture lots, as the share of the heirs of *Delabigarre ;* and the partition between them and *Mr. Livingston* was completed on the 8th April, 1822. The plan annexed to the act shows the lines of the levée and the prolongation of the streets as fixed by the compromise, and the lots are described by reference to those lines and streets. On the same day the heirs of *Delabigarre* sold to *Mr. Livingston* two of those five lots, and in the sale reference is had to the same plan. Part of the consideration of this sale consists in the sum of $940, the amount of the two promissory notes subscribed by *B. Lafon*, as executor of *Delabigarre*, to the order of *Joseph Ronfignac*, mayor of the city of New Orleans, as appears by the act of the 20th of September, 1820, which notes the said *Edward Livingston* promises and obligates himself to pay in the discharge of the vendors; and also of the sum of $839, being the amount advanced by *John W. Oddie*, agent of the vendors, for making the levée contemplated by the compromise.

It is objected that there is no proof of the authority of *Oddie* to represent the heirs of *Delabigarre* in these acts. After twenty years the authority of an agent is presumed, and twenty-three years elapsed after the execution of the acts before this objection was made. *Bedford* v. *Urquhart*, 8 La. 248. *Bourguignon* v. *Boudousquié*, 6 Martin N. S. 153.

But it is not necessary to resort to that presumption in this case. The plaintiff divided the three remaining lots into six, and sold them with reference to the plan under which they had been acquired. The acts of sale state that the property sold was acquired in part by the plaintiff from her sister, and in part by an act of partition between *Edward Livingston* and the heirs of *Delabigarre*, of whom the plaintiff is one, passed before *Hugues Lavergne*, late notary public in this city, on the 8th day of April, 1822, the very act in which *John W. Oddie* appeared as agent of the heirs of *Delabigarre*. The plaintiff has never claimed, and does not claim in this suit, the lots transferred to *Mr. Livingston* by that act; and she is estopped by her own declaration from questioning the authority of the agent who represented her therein.

It is true, as decided in the case of *Rivas' heirs* v. *Bernard*, 13 La. 159, that where a ratification is not express, facts must be established from which it necessarily results. But viewing, as we do, the compromise of 1820 as one entire contract, the acts of the plaintiff cannot be accounted for without a ratification of it. She has made the acts of *B. Lafon* and *John W. Oddie* her own, by executing voluntarily, more than twenty years before the institution of this suit, all the contracts they made for her and her sister, and she now stands as if she had herself signed the compromise. If it is not all binding upon her, no part of it is binding, and she may claim the ground given for the prolongation of the streets and for widening Tchoupitoulas street, as well as the batture.

It is further urged that, admitting the batture to have been dedicated to public use, the defendants are only entitled to that use as long as it is compatible

with the public interest; and that as they have passed a resolution ordering a portion of said batture to be sold, on the ground that, the batture from its great width had become useless as a public landing, that it was injurious to the public welfare, and caused great inconvenience and expense to commerce, and that the portion ordered to be sold was no longer required for public use, the plaintiff has the right to resume the possession of that portion.

The sovereign alone has the right to change the destination of public places. Under the state of facts presented by the record, the attempt of the defendants to change the destination of the ground was a glaring usurpation of power, from which no legal effects could result. It is proper to state that this attempt was not persevered in.

It is therefore decreed that the judgment of the District Court be reversed; and it is further decreed that the act of compromise of the 20th September, 1820, before *Hugues Lavergne*, notary, in the pleadings referred to, and whereof a copy is on file in this cause, be maintained, and have its full effect against the plaintiff; and that the petition of the plaintiff be dismissed, with costs in both courts.