PROVOSTY, J.
Tchoupitoulas street was at one time the public road along the bank of the Mississippi river leading to the country above New Orleans. What is now Common street, perpendicular to the river, was at one time the lower boundary of a plantation belonging to the Jesuits. This plantation had a frontage on the river of 32 arpents by a depth of 50. It was subdivided, after the title' of the Jesuits to it had been forfeited, and the lower 5-arpent front, the 5-arpent front next above what is now Common street, became in the course of time the property of one Bertrand Gravier. He, some time prior to 1797, subdivided this 5-arpent front, to a depth of 12 arpents, into squares, lots, and streets, to constitute a suburb of New Orleans, and called this suburb Faubourg St. Mary, and deposited the plan of it in the archives of the Spanish government. The upper boundary of this 5-arpent front by 50 in depth was what is now Delord street, which, like Common street, is perpendicular to the river. The land now between Tchoupitoulas street and the river and between Delord street above and Common street below has been made since then by alluvion. As soon as enough of this alluvion or batture had been formed for it to' be valuable as land, its ownership became a subject of controversy between, at first, the United States government and the owners of the lots fronting on the then public road, now Tchoupitoulas street, and later between the latter and the city; and even the state lay some claim. See as to this controversy Am. State Papers, vol. 6, p. 1 et seq.; Morgan v. Livingston et al. 6 Mart. (O. S.) 19; Delabigarre v. Municipality No. 2, 3 La. Ann. 230; Remy v. Municipality No. 2, 12 La. Ann. 500, and 11 La. Ann. 148; R. R. Co. v. New Orleans, 26 La. Ann. 478.
Bertrand Gravier, who, as just stated, established this Faubourg St. Mary, left four children and heirs. Three of them resided in France; one, Jean Gravier, in New Orleans. The latter sold two-thirds undivided of this new made land to Pierre Delabigarre, and the remaining one-third to Edward Livingston, through whom the plaintiffs in this suit claim title. Bertrand Gravier, father of Jean Gravier, had sold to one Poeyfare, who had transferred to Morgan, one of the lots fronting on the public road. In Morgan v. Livingston et al., supra, Morgan claimed from Livingston and Delabigarre the ownership of the batture in front of his lot by right of accretion, and was successful. In Gravier v. Livingston et al., 6 Mart. (O. S.) 281, the three heirs of Bertrand Gravier who *757 resided in France revendicated successfully from Livingston and Delabigarre a tbreefourtbs interest in tbis batture. Livingston acquired later a part of tbe interest of these three successful heirs; and Delabigarre remained owner of the one-fourth interest of Jean Gravier. In 1820 Livingston and the testamentary executor of Delabigarre and all the other private individuals having an interest in this batture entered into the first of the two contracts sought to be annulled in this suit. Some quarter of a century after this contract had been entered into the heirs of Delabigarre brought suit to annul it, on the ground that the testamentary executor had been without authority to enter into it, and, moreover, that it was a donation, and, as such, null for want of form. This court held the contract not to be a donation, but a commutative contract, and valid. The decision was handed down in 1848. Delabigarre v. Municipality No. 2, supra, 3 La. Ann. 230. The other contract sought to be annulled in the present suit was entered into in 1851 by some of the same persons who were parties to the contract of 1820 and the heirs and successors in title of the others.
The plaintiffs in the present suit are Julia Barton Hunt and Carle ton Hunt, the latter acting for himself and as a committee for Louise Livingston Hunt. The former is an heir of Cora Livingston Barton, sole heir of her father, Edward Livingston. Louise Livingston Hunt died pending this suit; and her universal legatee, Julia Barton Hunt," was substituted to her as party plaintiff.
They sue to annul said contracts, and to recover a part of said batture which, they allege, belongs to them as heirs of Edward Livingston.
The demand is against the city and the several railroads occupying with their tracks and buildings parts of this batture; and the said railroads and the city are made defendants.
The plaintiffs originally sued also as taxpayers, to compel the city to cause to be removed the railroad buildings and tracks which are upon the streets leading to the river over the land in controversy and to cause the said streets to be opened.
On motion of the defendants, plaintiffs were required to elect between this demand and their other demand, and they elected in favor of their said other demand, and their demand as taxpayers is no longer before the court.
In their original petition the plaintiffs did not describe the property they sue for otherwise than as appears from the following paragraphs of their petition:
“(2) That by authentic act executed before Hughes Lavergne, a notary public in the city of New Orleans, on the 20th day of September, 1S20. Edward Livingston and others executed a donation to the city of New Orleans of ‘all that portion of the batture of alluvion, which exists from the lower boundary of the property of Mr. William Montgomery, and in descending to the boundary between the city and Faubourg St. Mary, and the feet outside of the new levee on the water’s edge, when said river is at its lowest stage; also of the ground on which the levee then rested; also of the ground nccessax'y for the prolongation of the streets of said Faubourg to the said levee, and in the ground of Tchoupitoulas street on the whole front of the Faubourg aforesaid sixty feet wide including the banquettes.’ ”
“(4) That by another act executed before Hilary B. Oenas, notary public, on June 20, 1851, certain portions of the above-described property were divided into lots and sold, thus modifying to that extent only the previous act of donation of 1820.”
“(15) That by act executed in 1851 before Hilary B. Oenas, notary public, on June 20th, the three blocks bounded by South and North Market street in front of St. Mary’s Market, marked ‘Market’ on the plan annexed to said act, were reserved to the city, ‘upon condition that the said municipality shall erect thereon market houses or other public buildings, or shall have the same opened as public *759 squares, and shall in no event dispose or sell the same'as private property.’
“Wherefore petitioners pray * * * that the property donated by the act of 1820 and the three squares bounded by South and North Market streets in front of St. Mary’s Market be declared to now belong to your petitioners in fee simple absolute and free from any and all incumbrances whatsoever, excepting so far as the compromise made on June 30, 1851, by act before Hilary B. Cenas, has been carried into effect and executed. * * * ”
The defendants excepted on the ground that the description of the property claimed was too vague to enable them to answer; and, this exception having been sustained, and the plaintiffs ordered to make their allegations more specific, the plaintiffs filed for that purpose a supplemental petition in which the property claimed is described as follows:
“That your petitioners now annex the various titles showing the property owned by Edward Livingston and inherited by petitioners with all the rights of accretion thereto, hereto annexed and made part hereof as Exhibits A, B, C, D, E, F, G, I, J, and K.
“Wherefore petitioners pray * * * that all the property belonging to Edward Livingston and comprised between Gravier street and Howard avenue, Fulton street, and the Mississippi river, and also the three squares bounded by South and North Mai’ket streets from South Peters street up to the edge of the Mississippi river, be declared to now belong to your petitioners. * * * ”
Exhibits A, B, C, D, E, F, G, H, I, J, and K are very bulky. Perhaps a competent abstractor of titles might be able to make out from them what property belongs to plaintiffs, but this court is not an abstractor of titles; and hence this suit would have to be dismissed as in case of nonsuit for the reason of deficiency in the pleadings if there were not reasons for finally rejecting the demand of plaintiffs, and putting an end to the controversy, without going into the question of what property belongs to plaintiffs according to the said exhibits.
Besides this exception of vagueness, there were filed exceptions of want of capacity of the plaintiff Carleton Hunt to sue as “committee” of Louise Livingston Hunt; inconsistency in the causes of action; nonjoinder of parties plaintiff; misjoinder of parties defendant; no cause of' action; prescription ; res judicata. The exception of no cause of action was sustained, and is the only one that need be considered.
In the original and in the supplemental petition and in the original brief the case of plaintiffs is propounded on the theory of the contract of 1820 having been a donation. In the supplemental brief 'this theory is modified into the contention that the said contract, “by any-name you choose to call it,” was subject to a condition of re-entry in favor of Livingston and others in the event its terms were not complied with, and that these terms have not been complied with.
In the Delabigarre Case, supra, 3 La. Ann. 230, this court, as already stated, held the said contract of 1820 to have been a commutative contract, and not a donation. For arriving at that conclusion the court employed much more argument than appears to us to have been at all necessary, since the transaction was manifestly a compromise by which the city was renouncing any claims it might have to ownership or control over that part of the batture between the new levee and Tchoupitoulas street (see Am. State Papers, vol. 2, p. 3; also Delabigarre Case, 3 La. Ann. paragraph at bottom of page 236), and these other parties to the contract were renouncing all claims to the batture in front of the new levee and to future accretions, and were subjecting themselves to heavy money and other obligations; so that, as finally remarked by the court, the transaction was no more a donation than would be a transaction in which two parties made to each other reciprocally donations of a tract of land, and of a sum of money equal to the value of the land.
*761 [1] This contract having been commutative (as we understand learned counsel for plaintiffs now to concede), it could be resolved only by “placing matters in the same state as though the obligation had not existed” (C. C. 2045); and that is a thing now impossible to be done, since Livingston and others have sold to third persons the lots their titles to which were perfected by said contract, and hence cannot restore the city to her former position with reference to these lots.
[2] Another, and, if possible, a still more peremptory, reason why Livingston, or his heirs, and the other parties to said contract, or their heirs, are no longer in a position to demand its resolution, is that in 1851 they made a contract with the city which modified fundamentally, if it did not supplant entirely, this contract of 1820.
The contract of 1820 was passed before Hugues Lavergne, notary public. The parties to it were Joseph Roffignae, mayor of the city of New Orleans, on the one part, and, on the other part, the following: Edward Livingston, Jean Gravier, Louis Barthelmy, Macarty, Christopher Toledano, Yin-cent Rillieux, Toussaint Mosey, Elie Victor Jourdain, Manette St. Amand, f. w. e., Henry McCall, Joseph S. Winter, Alexander Labranche, Mme. Jeanne Bordier, Bertrand Gravier, Jr., Miss Jeanne Gravier, Barthelmy Lafon, as testamentary- executor of the estate of Pierre Delabigarre, and John W. Oddie, attorney in fact of Widow Delabigarre and of Marie Louise Delabigarre, widow of P. Stewart,- and of Miss Amaryllis Delabigarre.
• The contract, in its material parts, reads:
That these parties, “as actual owners of the batture in front of Faubourg St. Mary, wishing to accommodate the public with the use of the bank of the river which lies in front of said batture, and to facilitate the communication of the streets which ought' to open there, have by these presents made a donation inter vivos and irrevocable unto the mayor * * * of all the rights which the said donors now- have or may have each so far as he is concerned in” the space occupied by the new levee along the front and in the space between this levee and the river, and in the spaces occupied by Tchoupitoulas street, and By the streets perpendicular to the river if prolonged across said batture.
And the contract reads further:
“The present donation is made on the express condition, without which the said donation would not have taken place, that all the lots which form the subject of the present donation shall remain unalienable and not be seized for debt or otherwise in the possession of the corporation of New Orleans, which shall never have power under any pretext, and to this effect, said mayor, aldermen, and inhabitants, represented as aforesaid, are by these presents expressly bound to sell, exchange, donate, or otherwise dispose of in whole or in part in any manner whatsoever or to employ for any other public uses than those to which they are naturally destined, or even to make any erections of buildings, save, however, the single case wnerein the city council may deem it proper for the general interest to authorize the establishment of a fire engine on such portion of the batture thus given as the said council may believe ought to be chosen for that purpose. * * * And in consideration of the present donation and of the advantages to result therefrom to all the parties the said donors declared that they bind themselves jointly by these presents towards the said donee,” etc.
Here follows a recital of the obligations of the donors. Of these obligations it suffices to say that they were heavy, involving large money payments -and the expenditure of thousands of dollars. To secure the money part of these obligations a mortgage was given on that part of the lots whereof the donors remained the owners. The city apparently or so far as the mere wording of the contract went, parted with no consideration, unless it was the engagement which, “in consideration of the sum of $300 which the said donors bind themselves to pay,” the city entered into an engagement to cause a *763 public market to be established in Faubourg St. Mary.
The city, of course, accepted the “donation” (sic).
The wording of this contract as if in reality a donation, did not change its true nature. In that connection this court in the Delabigarre Case, supra, said:
“He [Livingston] must have been deeply impressed with the necessity of making such a transaction in relation to the whole matter as the city would accept and the Legislature ratify; for, wherever the public is concerned, the state is not without interest. In order to succeed, it was necessary not to expose the weakness of the title; hence the great anxiety of Mr. Livingston to abandon to the city all beyond a certain line, provided they would accept it in the form of a donation; hence all those bland entreaties for peace and good neighborhood which, after years of perseverance, finally accomplished his object. The acceptance by the corporation of a portion of the batture from the possessors as a gift virtually acknowledged their title to the remainder, and prevented the lawsuits which they feared. It was unquestionably the real cause of the contract, and, hs the contract itself was such as to satisfy in a great measure the wants and wishes of the city, it became the apparent interest of all parties to have it recognized by the Legislature. It was represented to that branch of the government' as a final compromise, ratified by them as such, and kept in full force after the division of the city, by an express provision of the act of 1836. [See section 11, p. 33, Acts 1836.] This ratification has rendered the title of the possessors to the portion they retained perfect; and the policy of the attempt now made to show that the act was not a compromise, which, if successful, would do away with it and reinstate the public in its original rights to the whole batture, is extremely doubtful. Prescription does not run against publii places and things out of commerce.”
The contract of 1851 was passed before Cenas, notary public. The parties to it were the municipality No. 2, on the one part (the city had been divided into municipalities), and the following persons, on the other part: Mrs. Louise Livingston, widow of Edward Livingston; Mrs. Cora Livingston Barton, child and sole heir of Edward Livingston; Christopher Toledano; the testamentary executor of Louis B. Macarty; the heirs of Elie Victor Jourdain; the heirs of Vincent Rillieux; the heirs of Mrs. Desiree Rillieux; the heirs of Toussaint Mosey; the heirs of John Sinton; Henry McCall; Mistress Mary P. Winter Whiting, heir of Joseph Winter; Miss Amaryllis Delabigarre, and her sister Mrs. Searle, as heirs of Peter Delabigarre; the heirs of Bertrand Gravier; the heirs of Alexander Labranche; A. Brothers; Henry Renshaw; C. D. Xancy; S. Duncan Linton; Randell Hunt; James G. Freret; Eugenie Stewart; Henry R. Denis; and James Stewart.
This contract, leaving out mere verbiage, provided as follows:
“Which said appearers declare that whereas, by the aforesaid act of September 28, 1820, the new levee, now constituting New Levee street, together with all the batture there formed, or which might thereafter be formed, on the outside of said levee extending to the waters edge of the River Mississippi, along the front of the then Faubourg St. Mary, frojn the city line below to the property of W. W. Montgomery above, were ceded and given to the city of New Orleans as property inalienable, and not liable to seizure, but to be forever left open for the uses to which it was naturally destined, which said property from that period to the present time has remained in. that condition, under the administration and at the expense of the city of New Orleans and of the second municipality thereof;
“And whereas, the said Batture has in the meantime increased to such a degree as to be no longer required in its full extent for the purposes contemplated by the parties to the said act;
“And whereas, the council of the municipality No. 2 did on the 17th of June, 1846, approve a plan drawn by George F. Dunbar for laying out three new streets, through the whole extent of said Batture, between New Levee street and the Mississippi river;
“And whereas, the said Batture is increasing every year in extent, and becoming less adopted to the object for which it was intended by the act of September 20, 1820, and, instead of *765 being an accommodation to the public and convenience to commerce, retards business:
“Now, therefore, the said appearers, having agreed to alter its destination moreover, declare that they do agree and stipulate as follows :
“First. That three streets, to be named Fulton street, Front street, and Delta street, shall be laid out and opened through the said batture according to the plan drawn by said Dunbar, and lots formed to be numbered and to have such form and dimensions as set forth on the plan prepared by Joseph A. Beard, auctioneer.
“Second. That the lots composing the squares between the said three new streets, shall be sold at public auction; * * * that the said lots shall be sold on the following terms, and conditions, to wit: One-fifth of the price to be paid in cash, and the balance in equal installments in one, two, three, and four years with 6 per cent, interest from the day of sale and 8 per cent, per annum after due, the payments whereof shall be secured by special mortgage on the property sold.
“Third. That immediately after the sale of the property aforesaid, or any portion thereof, the proceeds, whether in cash or notes, shall be divided and distributed in the manner following, to wit: One-third shall be paid and delivered to the proper persons authorized by law to receive the same, to be applied to the payment of the old city debt or general sinking fund of the city of New Orleans; one-third shall be paid and delivered to the original parties to the contract of the 20th of September, 1820, or to the heirs and legal representatives thereof, whose assent is given to the present agreement, each one respectively to receive in proportion to the front of the lots or portions of ground originally owned by him as shown by the said contract; and the remaining one-third of said proceeds shall be paid and delivered to the treasurer of the said municipality No. 2 for the exclusive use and benefit of the said municipality.
“Fourth. And it is, moreover, well understood and agreed to by and between said parties that the said one-third part of the proceeds aforesaid coming to the said parties of the second part shall be paid over to each of them in the proportions hereinabove set forth by the undersigned notary as soon as practicable after sales aforesaid. * * *
“Fifth. That the three squares or lots of ground between North Market and South Market streets, and designated on the plans as Markets, shall belong to the municipality No. 2, upon the condition that the said municipality shall erect thereon market houses, or other public buildings, or shall leave the same open as public squares and shall in no event dispose or sell the same as private property, and that all the portion of the batture between Delta street and the River Mississippi above Lafayette to the lines of Montgomery’s property, and all that portion of the. batture between Front street, and River Mississippi from Lafayette street down to Canal street, shall be and the same is hereby vested in perpetuity, and full ownership in the said municipality No. 2 in favor of whom the appearers to this act hereby cede and relinquish forever all their claims in and to the said batture, as well as all and every enlargement thereof or accretion thereto by new foundations.”
As appears from the hereinabove transcribed excerpts' from the decision in the Delabigarre Case, supra:
• “The acceptance by the corporation of a portion of the batture from the possessors, as a gift, virtually acknowledged their title to the remainder, and prevented the lawsuits which they feared.”
This remainder consisted of all that space along the front of Faubourg St. Mary between Tehoupitoulas street and the new levee. The effect of this contract therefore was, on the one hand, to perfect the titles of the private individuals signing it to tins space between Tehoupitoulas street and the new levee along the front, and, on the other hand, to deprive these individuals of all right or claim whatsoever to any other part of the batture, present or future, in front of Faubourg St. Mary, and to confirm .the city in the ownership of this other part of the batture, present or future, subject to the conditions of nonalienation and nonuser except for purposes of commerce.
These conditions were faithfully observed by the city. In the course of time, however, they became intolerable, and the city, in orr der to get rid of them, entered, in 1851, into the other contract with the signers of the contract of 1820 and their heirs and successors in title. By the latter contract the city obtained the consent of the parties to the *767 contract of 1820 that she should sell all that part of the batture between the new levee and Delta street above Lafayette street, and between the new levee and Front street below Lafayette street, according to a plan which had been made by a civil engineer named Dunbar, and for the rest of the batture, present and future, that she should be liberated entirely from the conditions imposed upon her by the contract of 1820; except as to the three squares mentioned in the paragraph fifth of the contract. These she was still not to be at liberty to alienate or to allow to be used for private purposes. In consideration of this liberation the city agreed that the lots on the plan in question should be sold at auction, and that one-third of the price should go to the said other parties to the contract.
By this contract of 1851 the obligation of the city not to alienate the batture, but to confine the uses of it to commerce, was totally done away with in so far as the signers of the contract of 1820 were concerned; and the last vestige of any legal connection between these signers and this batture on the river side of Delta street above Lafayette street and the river side of Front street below Lafayette street was totally obliterated.
In the course of time that part of this contract of 1851 providing for the sale of the lots between New Levee street and Delta and Front streets and a division of the price has been carried out, except as to 34 of the lots.
[3] In order to resolve this contract of 1851, all that has been done under it would have to be undone, the eggs would have to be unscrambled, a thing manifestly now impossible.
[4] -There is another peremptory reason why the petitions of plaintiffs show no cause of action. By the contract of 1820 the local proprietors divested themselves of “all rights which the said donors now have or may have in” the space occupied by Tchoupitoulas street and on the river side of it. They perfected their titles to the space on the land side of that street, and retained nothing else. The obligation which they imposed upon the city not to alienate any part of the batture thus abandoned to her, and to confine its uses to commerce, was not an obligation in their favor as private individuals, but in favor of the public; in their own favor only in their public capacities of citizens and taxpayers. So that, even if the contract of 1851 had not intervened, the plaintiffs would have been without right of action against the city, unless merely as citizens and taxpayers, for any failure on her part to observe said conditions.
In like manner, if, as alleged, the city is not living up to her engagement with reference to the three squares mentioned in paragraph fifth of the contract of 1851, the only cause of action the plaintiffs could possibly have against her (if any at all) would be as citizens and taxpayers.
Judgment affirmed.
MONROE, O. J., takes no part.
O’NIELL, J., concurs in the decree, but not in the opinion that the court cannot ascertain, from the Exhibits A to K what land is claimed by plaintiffs.