651 So.2d 878 (1995)
Henry George McCALL
v.
Harry McCALL, Jr.
No. 94-CA-1614.
Court of Appeal of Louisiana, Fourth Circuit.
February 23, 1995.
Order Denying Rehearing March 29, 1995.
*879 Thomas W. Tucker, Tucker & West, New Orleans, for appellant Harry McCall, Jr.
Susan H. Lafaye, New Orleans, for appellant Henry George McCall.
Joseph Bernstein, New Orleans, for intervenors/appellants Maury Toledano and Mary Lou Mossy Christovich.
Edward D. Markle, Barrett B. Daly, Markle & Daly, A.P.L.C., New Orleans, for defendant/appellee The Rivergate Development Corp.
Michael Botnick, New Orleans, for defendant/appellee The City of New Orleans.
Harry Rosenberg, Brent B. Barriere, Phelps Dunbar, L.L.P., New Orleans, for defendant/appellee Harrah's Jazz Co.
Before LOBRANO, WALTZER and MURRAY, JJ.
LOBRANO, Judge.
The issue in this appeal requires an interpretation of two agreements executed in 1820 and 1851. The plaintiffs and intervenors (collectively, plaintiffs) are seeking recognition of an undivided fee interest in certain streets which lie underneath the Rivergate *880 Convention Center in the City of New Orleans. The trial court granted summary judgement in favor of the City, the Rivergate Development Corporation and Grand Palais Casino, Inc. (collectively referred to as the City). Plaintiffs' claims arose when the City, on April 15, 1993, enacted an ordinance revoking the dedication of the streets under the Rivergate in anticipation of leasing the land and facility to the Rivergate Development Corporation for eventual lease to Grand Palais Casino, Inc.[1] Our inquiry necessarily requires a journey to a time when many familiar New Orleans landmarks of today were nothing more than the silt of America's heartland being carried by the currents of the Mississippi River.[2]
Sometime in the late 1700's Bertrand Gravier subdivided his property into lots and squares so as to constitute a suburb of New Orleans called "Faubourg St. Marie."[3] The upper (upriver) boundary of this suburb was Delord street (now Howard Avenue) and the lower (downriver) boundary was Common street. Gravier's property was bounded in the front by the river, separated only by Tchoupitoulas Street which, at that time, ran along the river's edge.
Apparently that portion of the river bank fronting this property is what modern terminology would call a "building" bank for in the following years there was major alluvial buildup. Sometime thereafter, a levee was built a considerable distance from Tchoupitoulas Street. Designated as New Levee (now South Peters St.) on maps of the day, the alluvion buildup continued so that by 1820 the batture extended far beyond New Levee. As a result, that area, as well as the alluvion on the landside of New Levee to Tchoupitoulas, became the subject of much controversy between the City and various individual proprietors who had purchased, from Gravier or his assigns, lots fronting the river. Among those individual proprietors were the ancestors in title to the plaintiffs herein.
In 1820, the individual landowners and the City entered into an agreement whereby the individual owners transferred to the City all of their rights and interest in and to: (1) the batture or alluvion between New Levee and the low water mark of the river, and to future accretions along the river; (2) the soil under the New Levee and the levee itself; (3) the soil necessary for the prolongation of the streets of Faubourg St. Mary to the New Levee, and (4) in the bed of Tchoupitoulas Street so as to give it a width of sixty feet. The transfer, however, was made subject to express conditions "without which the said donation will not take place."[4] Among those conditions were inalienability and the obligation not to put the land to any public use other than those "to which they are naturally destined." There could be no buildings or other constructions other than a provision for a fire station. In addition, the owners imposed on themselves the obligations of repairing and enlarging the existing levee, the building of revetments, to construct the streets between Tchoupitoulas and the New Levee and to build platforms and ramparts at their ends nearest the river, to destroy all the buildings then existing on the batture and to construct the buildings necessary for a public market in the faubourg. To secure these considerable financial obligations, the owners mortgaged, in favor of the City, the various lots they retained between New Levee and Tchoupitoulas.
In 1836, by act of the legislature, the city was divided into municipal districts referred to as municipalities. The batture transferred in the 1820 agreement fell in the Second Municipality, and the reservations and obligations in the said act were ratified by the *881 legislature.[5] Numerous theories are advanced as to what precipitated the agreement of 1851. Substantial alluvion had continued to increase the batture area in front of Faubourg St. Mary, far beyond that which existed in 1820. It is suggested that the original batture was no longer suited to the public purposes to which the original proprietors had destined the property in the 1820 agreement. Perhaps the city, apparently in financial difficulties, sought the opportunity to satisfy its debt by placing a portion of the batture in commerce. More probably a combination of these factors caused the city, in 1846, to have the surveyor, G.T. Dunbar, prepare a subdivision of the batture between New Levee and the river. In addition to subdividing the land into various squares and lots, he created three streets running in a general parallel direction with the river. Nearest the river was Delta Street. Front Street was next, and farthest from the river was Fulton Street. What had previously been described in the 1820 act as New Levee had since become a street called New Levee Street. It was on the landside of Fulton and ran parallel to it. The various streets running perpendicular to the river through the faubourg were extended to Delta Street.
As we previously noted, legislative approval was required to change the destination of a public place. It was apparent that even though the "public use" destination had been placed on the batture by the individual proprietors in the 1820 agreement, the City (or Municipality No. 2) had to obtain the blessing of the legislature to alienate the lots laid out on Dunbar's plan. Act 257 of 1850 was the resulting legislation. It authorized Municipality No. 2 to "cause to be laid off ... streets ... as represented on the plan by George T. Dunbar."[6] It further ordained that the batture between the river and the nearest street to it, Delta, be left open for the "accommodation of the public, and the convenience of commerce." And last, it provided "that in the event of an agreement between the original parties to the said compromise (of 1820) for the sale of said batture, it shall be the duty of the (city) to lay off into lots" the portion of the batture not previously reserved for streets. The last proviso required the city to use one-third of the sales' proceeds to satisfy the city's debts. Thus, the stage was set for the agreement of 1851.
On June 30th, 1851 the parties to the 1820 agreement, or their heirs, and Municipality No. Two executed a document entitled "Compromise between The Municipality No. Two and Certain Original Front Proprietors of Batture." The "whereas" preambles acknowledged the transfer of batture in the 1820 agreement; declared that since then, the batture has increased "to such a degree as to be no longer required in its full extent for the purposes contemplated by the parties" to the 1820 act; recognized Dunbar's plan of subdivision; and acknowledged the rapid increase of the batture every year. All of the appearers then declared that they agreed to alter the batture's destination, and then stipulated and agreed to the following:
First, that the three streets laid out by Dunbar were to be named Fulton, Front and Delta Streets. That Fulton and Front were to be sixty feet in width and that the lots were to be numbered and have such form and dimensions as set forth on a plan by Joseph Beard, Auctioneer.
Second, that the lots were to be sold at auction by the city auctioneer or by such other auctioneers designated by the parties to the act. Further, that acts of sale were to be passed and signed by the Finance Committee of the City and the purchasers and that, as signed, the sale "shall be binding upon all the said parties of the second part (i.e. the individuals to the 1820 act or their heirs) as Vendors." The parties further agreed on different time frames in which to sell the various lots and agreed on certain credit terms.
*882 Third, that one-third of the sales proceeds would be distributed to the city for debt retirement and that one-third would be distributed to "the original parties to the contract of ... 1820" based on the proportions of the front lots originally owned, and that the remaining one third would be paid into the city's general fund.
Fourth, that any notes received in consideration of the sales would be divided as equally as possible according to the responsibility and standing of the several drawers thereof.
Fifth, that the three squares designated on the plan as markets shall belong to the municipality conditioned upon the city erecting public buildings thereon, but in no event shall the lots be sold. Further, that all of the batture between Delta Street and the river, from Lafayette Street to Delord Street (upriver), and the batture between Front Street and the river, from Lafayette Street to Common Street (downriver) shall be vested in the municipality.
Over one hundred years later, in December of 1963, City Ordinance No. 2767 provided for the closure and abandonment of Fulton, Front and Delta Streets, in order to facilitate construction of the Rivergate Convention Center.[7] The Rivergate was completed in 1968.
In 1993, in anticipation of leasing the Rivergate property for casino gambling, the City once again, by Ordinance No. 15,779, revoked the dedication of Fulton, Front and Delta Streets.[8] By additional ordinances, the City formed the Rivergate Development Corporation (RDC) as a non-profit public benefit corporation pursuant to Louisiana Revised Statute 41:1212(G) and 1215(B). The Rivergate site was then leased to the RDC, who sub-leased it to the casino developer.
The revocation of the subject streets and the leasing to the Rivergate Development Corporation are the catalysts which prompted the instant lawsuit. Without reiterating its procedural quagmire, suffice it to say that plaintiffs and intervenors, as the heirs and descendants of three of the original owners of the batture in front of Faubourg St. Mary, filed the instant suit. Because of the City's action in declaring the streets as no longer needed for the purposes intended and the leasing of the property to the Rivergate Development Corporation, plaintiffs seek recognition of their ownership of an undivided interest in the subject streets. They pray for a partition of same and an accounting. Ancillary to their claim, the McCalls also challenge the validity of the Rivergate Development Corporation and its use as a conduit for leasing the property without abiding by the bid laws of the City and State.
The trial court granted summary judgement in favor of the City. The court, relying on Hunt v. City of New Orleans, 148 La. 754, 87 So. 736 (1921), writ dismissed, 260 U.S. 700, 43 S.Ct. 91, 67 L.Ed. 471 (1922), reasoned that "the signatories to the Compromise Agreements of 1820 and 1851 surrendered all of their rights to any part of the batture." This appeal followed.
Plaintiffs argue that the court was in error by relying on Hunt. Specifically, they assert that the language relied on was dicta, was not necessary to the adjudication of the issues raised in Hunt and is not controlling in the instant case. The thrust of their argument is that the 1851 agreement, in effect, superseded the 1820 agreement and returned the parties to their original positions. Thus says the plaintiffs, the 1851 act transferred title of the entire batture back to their ancestors, and since only the lots were sold at public auction, ownership of the streets remained in indivision, one third to the original owners and two thirds to the City. In support, they cite Delabigarre, supra; Parish v. Municipality No. 2, 8 La.Ann. 145 (La. 1853), and what they term as "indicia of ownership" in the 1851 agreement itself.
Although we agree that the Hunt decision is not dispositive of the issues raised in this appeal, for the following reasons we, nevertheless, *883 agree with the trial court and affirm its judgement.

SUMMARY JUDGMENT:
Appellate courts review summary judgments de novo and use the same criteria as the trial court. Schroeder v. Board of Supervisors, 591 So.2d 342 (La.1991); Kantack v. Progressive Insurance Company, 618 So.2d 494 (La.App. 4th Cir.1993), writ denied, 620 So.2d 845 (La.1993).
Summary judgment is proper only if the pleadings, depositions and affidavits show there is no genuine issue of material fact, and that mover is entitled to judgment as a matter of law. La.C.C.Pro.Article 966(B); Thornhill v. Black, Sivalls and Bryson, Inc., 394 So.2d 1189 (La.1981). The burden is on the mover to prove the absence of any genuine issue of material fact. Any doubt shall be resolved against the mover and in favor of a trial on the merits. Raine v. CECO Corporation, 627 So.2d 713 (La. App. 4th Cir.1993). Summary judgment is not to be used as a substitute for a trial on the merits.
The instant case involves documentary evidence. Basically this Court must determine the meaning and intent of the agreements of 1820 and 1851. The history preceding those agreements and the caselaw which involved them provide guidance in our task. For the following reasons, we find that there are no unresolved factual issues which prevent our resolution of this case.

THE HUNT DECISION
In Hunt, the plaintiffs, as heirs of Edward Livingston, sought annulment of the 1820 and 1851 agreements on the grounds that their terms were not complied with by the City. They alleged that the contract of 1820 was subject to a condition of "re-entry" if the City failed to abide by its terms and conditions. The issue reached the Louisiana Supreme Court via the trial court's grant of an exception of no cause of action.
In rejecting the Hunts' claims, the court first noted that the Delabigarre decision recognized the 1820 agreement as a compromise whereby the individual owners relinquished any claims they had to the batture between New Levee and the river, and the city relinquished any claims it had to that portion of the batture between New Levee and Tchoupitoulas. The court then held that, since the contract was commutative, the issue could only be resolved by "`placing matters in the same state as though the obligation had not existed' (C.C.2045); and that is a thing now impossible since Livingston and others have sold to third parties" lots on the landside of New Levee, and thus the City cannot be returned to its former position.[9] The court further held that the 1851 agreement substantially modified the 1820 act and, in effect, did away with the conditions, the breach of which the plaintiffs now complain. Since the terms of the 1851 agreement had been carried out, the court reasoned that "all that has been done under it would have to be undone, the eggs unscrambled, a thing now manifestly impossible."
The Hunt decision could have ended with the aforesaid holding but it did not. For whatever reason, the Court went on to give its interpretation of the meaning and legal effects of the two agreements. The Court found the 1851 agreement "modified fundamentally, if it did not supplant entirely," the contract of 1820. Again citing Delabigarre, the Court declared that the city, by accepting a portion of the batture from the possessors as a gift, virtually acknowledged their title to the remainder. The Hunt court described this remainder as consisting of "all that space along the front of Faubourg St. Mary between Tchoupitoulas Street and the new levee." The effect was to perfect the landowners' titles to this space and to deprive them of all right or claim to any other part of the batture, present and future in front of the Faubourg St. Mary and to confirm the City's ownership of this portion, present or future, subject to the condition of nonalienation and nonuse except for commerce. The Court went on to characterize *884 the 1851 agreement as a contract to liberate the City from these conditions. In consideration of this "liberation", the City agreed to sell the lots and give one-third of the proceeds to the landowners. It was also agreed that the portion of the new batture not divided into lots would belong to the City in full ownership without any conditions imposed.
We agree with plaintiffs that Hunt is not controlling. The language relied on by the trial court is indeed dicta.[10] The Hunt plaintiffs were seeking to set aside the 1820 and 1851 agreements whereas plaintiffs in the instant suit seek title to the subject street beds via interpretation of the 1851 agreement. Interpretation of both the agreements is the mechanism to resolving this case, which we now proceed to do.

COMPROMISE OF 1820:
We are satisfied that, in the 1820 agreement, the individual landowners renounced all claims they had to the batture from New Levee to the river, as well as all future accretions. The history leading to this agreement, as recited in Delabigarre v. Second Municipality of New Orleans, supra, and the holding of that decision support this conclusion.[11]
The plaintiff in Delabigarre filed suit in response to a resolution of the City Council in 1846 authorizing the laying out of streets on the batture in question and the subdivision and sale of various lots. Because she wanted a portion of the proceeds, plaintiff sought to rescind the agreement of 1820 on the basis that it was an Act of Donation and that the executor of her father's succession was not authorized to enter into an Act of Donation.
In reviewing and interpreting the agreement the Court rejected plaintiffs' argument. The Court explained the legal effects of the agreement by finding that the City, by accepting the batture from New Levee to the river, acknowledged the landowners' title to the "remainder". The Court found the purpose of the agreement was to recognize and perfect the individual landowners' title to the land between Tchoupitoulas and New Levee and to recognize and perfect the City's title to the land, present and future, on the river side of New Levee. Pursuant to this purpose, the Court concluded that the agreement was a compromise in order to settle and prevent litigation. The Court described the potential for litigation as follows:
Again the main question of fact upon which the case of Gravier turned was that, at the time of the establishment of faubourg St. Mary a batture susceptible of private ownership existed on the whole line of the levee. Now, in 1819, just before Mr. Livingston's purchase, it was held by the late Supreme Court in the case of Morgan v. Livingston, that there was no batture susceptible of private ownership at that time in front of a considerable portion of the levee. Whoever peruses the testimony in that case will find it difficult not to give it faith. If that testimony was true, that in Gravier's case was false; and had the judgment been rendered between proper parties, the city had twenty years, under the laws then in force, to set it aside on that ground, by an action of nullity. (citations omitted)
These were the dangers of eviction, troubles, and disturbances to which Mr. Livingston had reference in his purchase from the heirs of Bertrand Gravier, and which induced him to acknowledge, in 1819, that his title was defective, and to cancel on that ground the sale of two batture lots made by him the year previous to Vincent Nolte. He must have been deeply impressed with the necessity of making such a transaction in relation to the whole matter, as the city would accept and the legislature ratify; for, wherever the public is concerned, the State is not without interest. *885 In order to succeed, it was necessary not to expose the weakness of the title; hence the great anxiety of Mr. Livingston to abandon to the city all beyond a certain line, provided they would accept it in the form of a donation; hence all those bland entreaties for peace and good neighborhood which after years of perseverance, finally accomplished his object. The acceptance by the corporation of a portion of the batture from the possessors, as a gift, virtually acknowledged their title to the remainder, and prevented the law-suits which they feared. It was unquestionably the real cause of the contract, and as the contract itself was such as to satisfy in a great measure the wants and wishes of the city, it became the apparent interest of all parties to have it recognized by the legislature. It was represented to that branch of the government as a final compromise, ratified by them as such, and kept in full force after the division of the city, by an express provision of the act of 1836. This ratification has rendered the title of the possessors to the portion they retained perfect; and the policy of the attempt now made to show that the act was not a compromise, which if successful would do away with it and reinstate the public in its original rights to the whole batture, is extremely doubtful. Prescription does not run against public places and things out of commerce. (emphasis added) at 236-237.
The Court concluded that the agreement was not a donation but a commutative contract. The City became the naked owner of the batture, while the landowners retained the right to use it. As long as the terms of the compromise were fulfilled, the landowners had no title claim to that portion of the batture on the river side of New Levee.
Thus, there can be no question that subsequent to the execution of the 1820 agreement the individual landowners had divested themselves of all interest in the batture between New Levee and the river.

COMPROMISE OF 1851:
As we previously noted, the 1851 agreement was preceded by legislative Act 257 of 1850. That act authorized the change of destination of the City owned batture, with the proviso that an agreement could be reached with the original signatories (or their heirs) to the 1820 agreement. Obviously, the City was concerned with the prospect of "re-entry" of title of the original landowners if the conditions of the 1820 agreement were breached.[12] Thus, the necessity for their consent to change the "public destination" of the batture.
Plaintiffs argue that when the 1851 agreement was executed, it superseded the 1820 agreement and returned the parties to their original status. They urge that the agreement transferred title back to their ancestors to all the batture from New Levee to the river. Or, at the very least, they urge that the City and the individuals became owners in indivision of the property at issue in the proportions of two-thirds and one-third, respectively. And, the underlying basis of their argument is that material factual issues remain as to the intent of that agreement so as to preclude summary judgment. We disagree.
Although it will never be known whether the "right of re-entry" of title would have been recognized had the City breached the 1820 agreement, we are satisfied that the potential for such an occurrence was the underlying cause for obtaining the consent of the original landowners (or their heirs) to the 1851 agreement.[13] And, for the following reasons, we conclude that that agreement did not transfer title to Front, Fulton and Delta Streets back to plaintiffs' ancestors.
With respect to the transfer of immovable property, the law of Louisiana has been consistent since, at least, the Code of 1808. Every transfer of immovables must be *886 in writing.[14] An oral transfer may be valid between the parties if there has been actual delivery and the transferor recognizes the transfer under oath. Id. There must be a deed translative of title. Pruyn v. Gay, 159 La. 981, 106 So. 536 (1925), quoting Trichel v. Home Ins. Co., 155 La. 459, 99 So. 403 (1924).
A careful review of the 1851 document, as well as the history leading to its execution, convince us that it does not transfer title back to the original owners. Simply put, the document does not contain any language translative of title or which indicates an intent to transfer title. Despite plaintiffs' arguments to the contrary, we find that the "indicia of ownership" argued by them do not support the conclusion that title was transferred.
Plaintiffs claim that the "whereas" preamble and five stipulation sections show recognition by the City of ownership by the individuals. For example, plaintiffs assert that because the owners joined with the City and agreed to the widening of certain streets and the creation of the three streets at issue, somehow that was an indicia of joint ownership of those streets. Plaintiffs also claim that because the agreement permitted the sale by auctioneers approved by all the parties to the Act, a clear indication of joint control and ownership was established. We disagree.
For the reasons previously noted, the City obviously believed it was necessary to obtain the consent of the original owners before selling the lots established on the Dunbar plan. Whether that belief was real or perceived is not the issue. It is quite clear that the 1851 agreement was confected so that there could be no subsequent claims that the City breached the 1820 agreement by subdividing and selling lots. Pure and simple, this was a compromise by the prior owners and the City whereby the owners received one-third of the sales price of the lots and the City received the owner's release of the restrictions imposed in the 1820 agreement. Thus, the City was protected from future litigation for "violating" the conditions of the 1820 agreement.
The "indicia of ownership" upon which plaintiffs rely, in reality, reflect nothing more than the owners' consent to what the City was attempting to accomplish. That is the essence of a compromise. The City believed it could not take unilateral action and therefore required the consent of the owners to each stipulation in the agreement. Obtaining that consent did not transfer title to the lots or streets at issue back to the original owners.
We hold that the purpose (or cause) of the 1851 compromise was to end the City's fear that if it sold the property transferred to it in the 1820 agreement, the landowners might have a claim to that property. To prevent that from happening, the City agreed to give the original landowners one-third of the sale proceeds in return for lifting the conditions imposed in 1820. The sale proceeds were the inducement which led to the owner's consent. Distribution of one-third of the proceeds to the owners did not equate to transfer of a one-third interest in the property.[15]

*887 ORGANIZATION AND OPERATION OF THE RIVERGATE DEVELOPMENT CORPORATION:

Plaintiffs assert the RDC exceeded both constitutional and City Charter authority in the acquisition and subsequent lease of the Rivergate property to the Casino developer. Plaintiffs raise the following issues:
1) The City does not own the property at issue in this matter and therefore does not have the power or the authority to sell or lease private property. Any sale or lease of private property is a violation of the Louisiana State Constitution;
2) The City does not have power or authority to lease property it owns to third parties;
3) The City and the RDC are not allowed under the Constitution to operate a business or to own stock in a business.
Defendants counter that plaintiffs do not have standing to assert those issues because they have no real or actual interest in the action asserted. C.C.Pro Article 681. Defendant's assert that in order to meet this requirement, a plaintiff must show an interest in the litigation peculiar to him personally and separate from that of the general public and cite League of Women Voters v. City of New Orleans, 381 So.2d 441 (La.1980) in support thereof.
Although we hold that plaintiff's do not own an interest in the streets at issue, that holding does not necessarily resolve the issue of plaintiffs' standing to challenge the actions of the RDC. The trial court did not address this issue. We therefore remand for a determination of plaintiffs' standing and their arguments with respect to the validity and operation of the RDC.

SANCTIONS:
Harry McCall, Jr.'s Motion for Sanctions based on defendants' Motion to Expedite Appeal is without merit.
It is improper for this court to award sanctions pursuant to Louisiana Code of Civil Procedure Article 863. The authority to impose sanctions pursuant to article 863 is limited to the trial court. Hampton v. Greenfield, 618 So.2d 859 (La.1993). An appellate courts' authority to regulate conduct before it is governed by Louisiana Code of Civil Procedure Article 2164 which provides, in pertinent part, the court may award damages for frivolous appeal. Hampton, supra. Damages for frivolous appeal are allowed only when "it is obvious that the appeal was taken solely for delay or that counsel is not sincere in the view of the law he advocates even though the court is of the opinion that such view is not meritorious." Hampton, supra. citing Parker v. Interstate Life and Accident Ins. Co., 248 La. 449, 179 So.2d 634, 636-37 (1965). Appellee's motion for expedited appeal is not a "frivolous appeal" within the meaning and interest of Article 2164. McCall's request for sanctions is denied.
For the reasons assigned above, the judgment of the trial court is affirmed. The case is remanded for further proceedings consistent with this opinion.
AFFIRMED AND REMANDED.
MURRAY, J., concurs in part; dissents in part.
MURRAY, Judge, concurs in part; dissenting in part.
Although I concur with the majority's conclusion that the plaintiffs are not owners of the property in question, I disagree with this Court's order of remand for a determination of plaintiffs' standing with regard to the actions of the City of New Orleans and the Rivergate Development Corporation.
A plaintiff seeking to challenge the actions of the City, as do the plaintiffs in this case, must assert an interest in the litigation peculiar to herself personally and separate from that of the general public. League of Women Voters v. City of New Orleans, 381 So.2d 441 (La.1980). Plaintiffs herein assert their ownership of the property, and there is no question that as owners of the property they would have standing. However, this Court has determined that they are not owners. Since the plaintiffs have alleged no other interest in the litigation peculiar to them personally, separate from the interest of the general public, they have no standing. Therefore, I believe this Court errs in its *888 order. Remand is uncalled for and will needlessly delay the resolution of this dispute.

ON APPLICATION FOR REHEARING
PER CURIAM.
We deny the request for rehearing filed by appellants and intervenors. However, we are compelled to address the issue raised with respect to reargument before a five-judge panel.
Two basic issues were raised in the appeal of this case.[1] The first involved the correctness of the trial court's summary judgment which resolved the title question, and the second involving the authority of the RDC to lease the Rivergate property to the Casino developer. The trial court did not address this second issue.
In our original opinion we held:
"Although we hold that plaintiffs do not own an interest in the streets at issue, that holding does not necessarily resolve the issue of plaintiffs' standing to challenge the actions of the RDC. The trial court did not address this issue. We therefore remand for a determination of plaintiffs' standing and their arguments with respect to the validity and operation of the RDC." McCall v. McCall, 94-1641 (La.App. 4th Cir. 2/23/95) at p. 887.
Although Judge Murray dissented in part on the decision to remand, we are of the opinion that Article V, Sec. 8(B) is not applicable. We did not "modify or reverse" the trial court judgment because there was no judgment on this issue. Arguably, the judgment dismissing plaintiffs' suit can be construed as a rejection by the trial court of the "RDC" issue. However, we construe it (the judgment) as a grant of summary judgment only on the title issue. The "RDC" issue was never addressed by the trial court and thus, the reason for our "Affirm and Remand."
Appellant, in footnote 1 of his supplemental application for rehearing, suggests that he can't recall "ever having seen such a ruling." However, it is not unusual. See, for example, Charia v. Hulse, 619 So.2d 1099 (La.App. 4th Cir.1993); Cabibi and Cabibi v. Hatheway, 570 So.2d 104 (La.App. 4th Cir.1990), writ denied, 572 So.2d 91 (La.1991); Bradford v. Murray, 467 So.2d 1297 (La.App. 4th Cir.1985), writ denied, 469 So.2d 988 (La. 1985).
REHEARING DENIED.
NOTES
[1] Ordinance Number 15,799 M.C.S.
[2] The history we recite is by no means the result of intensive background research. We rely on what is in the record and what has been written in previous opinions dealing with the area in controversy.
[3] The parties use "St. Marie" and "St. Mary" interchangeably.
[4] The 1820 document is styled as a donation. Subsequent litigation involving that agreement characterized the instrument as a compromise between the city and the owners. The reason for that characterization will be discussed, infra.
[5] It must be kept in mind that during that period of time, the city was not controlled by Home Rule Charter. Anything dealing with the public and public interest had to receive the blessing of the State legislature. In Delabigarre v. Second Municipality, 3 La.Ann. 230, (1848), the very concluding paragraph reflects the necessity of legislative approval with respect to changing the destination of public places.
[6] The act recites two streets whereas the Dunbar plan actually had three streets.
[7] The ordinance also closed two sections of Gravier and Common Streets. However, they are not part of this litigation.
[8] By Act 384 of 1992, the Louisiana legislature approved land based casino gambling and mandated that the official gaming establishment be located at the Rivergate Convention Center.
[9] Civil Code Article 2045, at that time, provided in part:

"The dissolving condition is that which, when accomplished, operates the revocation of the obligation, placing matters in the same state as though the obligation had no existed."
[10] We also note the Hunt court's inconsistent statement in headnote (4) wherein it was said that the landowners, via the Compromise of 1820, divested themselves of all rights they had in "the space occupied by Tchoupitoulas Street and on the river side of it. They perfected their titles to the space on the land side of that street and retained nothing else." (emphasis added). Obviously that statement is incorrect since the 1820 agreement transferred to the City the batture from New Levee to the river, not from Tchoupitoulas to the river.
[11] Indeed, intervenors, in brief, agree with our conclusion with respect to that agreement.
[12] This right of re-entry was recognized in the concurring opinion in Parish v. Municipality No. 2, 8 La.Ann. 145 (1853) at p. 153, two years after the 1851 agreement.
[13] Of course, the City could have argued that the stipulations or conditions of the 1820 agreement were not in favor of the individual owners, but were in favor of the public and that the individual owners did not have any re-entry rights.
[14] See, La.C.C. Art. 1839; La.C.C. Art. 2275 (1870); La.C.C. Art. 2255 (1825); La.C.C. Art. 241 (1808).
[15] We note with interest an analogous result, albeit by different reasoning, reached by the court in New Orleans, Mobile and Chattanooga Railroad Company v. City of New Orleans, 26 La.Ann. 478 (1874). There, the Court held that the City acquired ownership of the batture in a private capacity so that the State, by legislative act, could not transfer it to the railroad. That court observed:

"The act of 1850 (Act 257) may have been necessary to give the Municipality No. 2 the authority to enter into an agreement with the owners; but the power having been exercised and the conditions complied with, the title of said parties (which was recognized in the said act) vested, by the notarial act of June, 1851, as we think, in the municipality, when they took the place of the said former owners, with all their rights, including the right to bring into commerce such portions as might become unnecessary for public use." at p. 486.
In addition, we distinguish Remy v. Municipality No. Two, 11 La.Ann. 148 (1856); Gaiennie v. Second Municipality of New Orleans, 11 La.Ann. 738 (1956) and Kennedy v. Municipality No. Two, 10 La.Ann. 54 (1855). Those cases involve the issue of whether the City could acquire the batture by prescription against those who still retained title.
[1] Sanctions were also at issue. However it was not part of the trial court proceedings, but was raised for the first time on appeal.