31 So.3d 397 (2009)
Angelina CANTUBA
v.
The AMERICAN BUREAU OF SHIPPING and Mitsubishi Heavy Industries, Ltd.
No. 2008-CA-0497.
Court of Appeal of Louisiana, Fourth Circuit.
June 3, 2009.
Rehearing Granted August 10, 2009.
Opinion Reversed in Part and Remanded on Rehearing January 13, 2010.
*398 Randy J. Ungar, George Byrne, Jr., Kristi A. Post, New Orleans, LA, and John M. O'Quinn, O'Quinn Law Firm, Houston, TX, and Charles B. Musslewhite, Jr., Musslewhite *399 & Associates, P.C., Houston, TX, and Mark D. Plaisance, Baker, LA, for Plaintiff/Appellant.
A. Gordon Grant, Jr., Kenneth J. Gelpi, Jr., Ryan M. McCabe, Montgomery Barnett Brown Hammond & Mintz, L.L.P., New Orleans, LA, for The Salvage Association, Ltd. and Paul Francis Daniel.
Robert B. Acomb, Jr., James E. Wright III, Jones Walker Waechter Poitevent Carrere & Denegre, L.L.P., New Orleans, LA, for Mitsubishi Heavy Industries, Ltd.
David L. Carrigee, Jedd S. Malish, Baldwin Haspel Burke & Mayer, New Orleans, LA, for Defendant/Appellee, American Bureau of Shipping.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge TERRI F. LOVE, Judge DAVID S. GORBATY, Judge EDWIN A. LOMBARD, Judge ROLAND L. BELSOME).
DAVID S. GORBATY, Judge.
In this appeal, plaintiffs assert that the trial court erred in dismissing their claims and denying their motion for new trial. For the reasons set forth below, we affirm.

FACTS AND PROCEDURAL HISTORY
Plaintiffs-Appellants ("Appellants") are relatives and personal representatives of Greek and Filipino seamen who were aboard the M/V MARIKA on January 1, 1994. On that date, the vessel disappeared in a North Atlantic winter storm while in international waters en route from Canada to the Netherlands. Neither the vessel nor any crewmembers were ever recovered. Suit was filed in Orleans Parish on October 13, 1994, against Mitsubishi Heavy Industries ("MHI"), the company who constructed the vessel; the American Bureau of Shipping ("ABS"), the surveyors who certified that the vessel was seaworthy after repairs in Greece in April 1993; and The Salvage Association, Ltd. ("SA") and Paul Francis Daniel ("Daniel"), the surveyors who, in conjunction with the vessel's hull insurance policy, performed a survey in Brazil in October 1993 and concluded that the vessel's condition was satisfactory.
The litigation was interrupted at various times due to the events of September 11, 2001; litigation involving forum non conveniens, the aftermath of Hurricane Katrina in 2005, Typhoon Durian in the Philippines in 2006, and the process of obtaining visas for the Filipino plaintiffs to travel to the United States for deposition purposes.
On July 30, 2007, SA and Paul Francis Daniel filed a motion for summary judgment. The trial court granted Daniel and SA's motion for summary judgment on October 3, 2007, as well as a motion for summary judgment filed by ABS. That same date, the trial court also granted a motion to dismiss the Filipino plaintiffs that had been filed by MHI on June 28, 2007. Appellants' motion for new trial was denied on October 16, 2007. On November 15, 2007, the trial court issued written reasons for each of the three judgments. This appeal followed.
On June 3, 2009, this Court affirmed the trial court's dismissal of all Defendants-Appellants. Cantuba v. American Bureau of Shipping and Mitsubishi Heavy Industries, Ltd., XXXX-XXXX (La.App. 4 Cir. 6/3/09), 31 So.3d 397, 2009 WL 1564474. On August 10, 2009, rehearing was granted, ordering the matter reset for oral argument on November 17, 2009.

STANDARD OF REVIEW
An appellate court generally reviews a judgment granting dismissal under the abuse of discretion standard. Ridgeway v. Pierre, XXXX-XXXX, p. 4 (La.App. 4 Cir. 1/11/07), 950 So.2d 884, 888. Appellate courts review summary judgments de novo while applying the same criteria applied *400 by trial courts to determine whether summary judgment is appropriate. Huber v. Liberty Mut. Ins. Co., XXXX-XXXX, p. 5 (La.App. 4 Cir. 2/7/01), 780 So.2d 551, 554.

DISCUSSION
On appeal, Appellants assert five assignments of error: 1) the trial court erred in dismissing the claims of the Filipino Appellants against MHI pursuant to La.Code Civ. Proc. art. 1471 and in denying the motion for new trial when there was no showing of willfulness, bad faith, or fault on the part of the claimants; 2) the trial court erred in dismissing Appellants' claims against MHI because there was sufficient evidence in the record which justified Appellants' failure to appear for depositions in New Orleans; 3) the trial court erred in dismissing Appellants' claims with prejudice because less drastic sanctions would have been effective and MHI's trial preparation was not prejudiced; 4) the trial court erred in granting ABS' motion for summary judgment because genuine issues of material fact existed regarding the reliance by the officers and crew of the vessel on the survey performed by ABS; and 5) the trial court erred in granting SA and Paul Francis Daniel's motion for summary judgment because genuine issues of material fact existed regarding the reliance by the officers and crew of the vessel on the survey performed by SA and Daniel.

MITSUBISHI HEAVY INDUSTRIES
The first three assignments of error all concern the same issue: plaintiffs' failure to appear for deposition.
La. C.C.P. art. 1471 provides in pertinent part:
If a party ... fails to obey an order to provide or permit discovery ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
(3) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.
Trial courts in Louisiana have broad discretion when regulating pre-trial discovery. This discretion will not be disturbed on appeal absent a clear showing of abuse. Moak v. Illinois Cent. R. Co., 93-0783 (La.1/14/94), 631 So.2d 401. In Hutchison v. Westport Insurance Corp., XXXX-XXXX (La.11/8/04), 886 So.2d 438, the Supreme Court recognized that a trial court has much discretion in imposing sanctions on litigants for failure to comply with discovery orders, and noted, "Although dismissal is a harsh remedy, this case is deserving of a harsh remedy, as these tactics and delays frustrate the judicial system." Id. at 440.
Plaintiffs state that they could not comply with discovery orders because of Hurricane Katrina, post-9/11 travel restrictions, and Typhoon Durian (a catastrophic typhoon in the Philippines). Many plaintiffs lived in remote areas of the Philippines, further slowing the process of reapplying for visas. Plaintiffs point out that Mr. Musslewhite, plaintiffs' counsel, traveled to Manila in order to participate in the visa application process to the extent allowed.
The Filipino plaintiffs violated court orders to appear in New Orleans for deposition multiple times. The Filipino plaintiffs filed suits in Civil District Court for the Parish of Orleans in 1994. In February 2000, they were ordered by the trial court to appear in New Orleans for depositions. None of the plaintiffs appeared, nor was the court advised that they would not appear. *401 In 2005, MHI filed a motion to dismiss. Plaintiffs responded that they were unable to obtain a visa to travel to New Orleans. In February 2005, the court denied that motion, but ordered plaintiffs to reapply for a visa at the U.S. Embassy in Manila. If that application was unsuccessful, plaintiffs were to notify the court so that a status conference could be scheduled.
In August 2006, MHI obtained permission from the court to file Supplemental Interrogatories and Requests for Production of Documents to the Filipino plaintiffs in an effort to learn whether they had reapplied for visas as ordered by the court. No answer was received, and a Motion to Compel was filed. The responses eventually received in December 2006 indicated that plaintiffs had done nothing and had failed to reapply for visas at the U.S. Embassy.
Plaintiffs did not attempt to reapply for visas until after MHI filed its second Motion to Dismiss on June 28, 2007. MHI introduced the affidavits of immigration attorney/expert, Mark Murov, who stated that the efforts by plaintiffs and their counsel to procure visas were "woefully inadequate" even by minimum standards that any layperson could easily have learned. Plaintiff offered no affidavit or other evidence that would excuse their inaction and noncompliance with the trial court's orders.
This case illustrates a complete refusal of the litigants and their attorneys to comply with the orders of the trial court. The trial court properly dismissed the claims because its orders were flouted, defied and ignored for 8 years. Plaintiffs disregarded the order to reapply for visas for two and a half years, and made no effort to reapply for visas until after the defendants moved to dismiss plaintiffs' suits. Plaintiffs were aware of the need to travel to the United States for depositions, but repeatedly failed to take steps to do so.
Under these specific circumstances, we conclude that the trial court did not abuse its broad discretion. We distinguish this case from Columbia Homestead Ass'n v. Arnoult, 615 So.2d 1 (La.App. 4 Cir.1992), and its progeny, in light of the particular facts of this case. Here, the plaintiffs' repeated and egregious failure to comply with orders over a period of several years justifies the remedy imposed. As such, this portion of the trial court's judgment is affirmed.

AMERICAN BUREAU OF SHIPPING
In the fourth assignment of error, Appellants assert that the trial court erred in granting ABS's motion for summary judgment because genuine issues of material fact existed regarding reliance by the officers and crew on the survey performed by ABS.
ABS performed a survey on the hull of the M/V MARIKA in Pireaus, Greece between March 12 and April 15 of 1993. Repairs were made to the vessel during this period as well. The ABS survey report found that there were no outstanding class items[1] and that the vessel was in satisfactory condition upon completion of the repairs, issuing a Cargo Ship Safety Construction Certificate on April 15, 1993 to the vessel. After the repairs, the vessel successfully traveled to France, South Africa, Slovenia, and Brazil.
Appellants argued that ABS is liable for negligent misrepresentations made in warranting that the M/V MARIKA was seaworthy. ABS filed a motion for summary judgment, and on October 3, 2007, the trial *402 court granted the motion, dismissing all claims against ABS.
It is well-settled that a shipowner has a non-delegable duty to maintain a vessel's seaworthiness. See, e.g., Sundance Cruises Corp. v. American Bureau of Shipping, 799 F.Supp. 363, 385 (S.D.N.Y.1992). "[Societies' surveys and certificate system are essential to maintaining the safety of maritime commerce, yet their activities should not derogate from shipowners' and charterers' non-delegable duty to maintain seaworthy vessels." Otto Candies, LLC v. Nippon Kaiji Kyokai Corp., 346 F.3d 530, 532 (5th Cir.2003). A classification certificate is thus not obtained to guarantee the vessel's safety, but is a requirement to procuring hull insurance, and can allow a vessel owner to obtain lower insurance premiums. Sundance, 799 F.Supp. at 369.
In Otto Candies, supra, the court enumerated the four factors that a plaintiff must establish in order to prevail on a claim of negligent misrepresentation:
1) That the classification society, in the course of its profession, supplied false information for the crew's guidance in a business transaction;
2) That the classification society failed to exercise reasonable care in gathering the information;
3) That the crew justifiably relied on the false information in a transaction that the classification society intended to influence; and
4) That the crewmembers thereby suffered pecuniary loss as a result of its reliance.
Otto Candies, 346 F.3d at 535. The court also noted that a plaintiff claiming negligent misrepresentation must be a "person, or a member of a `limited group' of persons for whose benefit and guidance the [classification society] either intends to supply the information or knows the recipient intends to supply it." Id. (quoting Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 318 (5th Cir.2002).
Appellants in this case rely on Otto Candies for the proposition that ABS is liable for negligent misrepresentation. In Otto Candies, the owner of a vessel that had been classified by NKK (the SPEEDER), a Japanese vessel classification society, agreed to sell the SPEEDER to Otto Candies. Otto Candies, 346 F.3d at 532. Because the classification had lapsed, however, the sale agreement was conditioned upon NKK reclassifying the SPEEDER to be free from any outstanding recommendations. Id. NKK certified the vessel, issuing a Class Maintenance Certificate to the owner. Id. After this transaction was completed, Otto Candies issued payment for the SPEEDER, and transported it from Japan to Mobile, Alabama. Id. Otto Candies retained ABS subsequent to the sale to survey the vessel and transfer the classification from NKK to ABS. Id. The ABS surveyor, however, noted serious deficiencies[2] in the SPEEDER and found *403 that it required extensive repairs before ABS could classify it. Id. The vessel was ultimately repaired at a cost to Otto Candies of $328,096.43. Id. Otto Candies filed suit to recover the costs of repairs needed to obtain the ABS certificate, asserting that NKK was liable for negligent misrepresentation in certifying that the SPEEDER was free from outstanding recommendations. Id. at 533.
Before determining that Otto Candies could bring a negligent misrepresentation claim, the Fifth Circuit emphasized that claims for negligent misrepresentation must be strictly and carefully limited, as the imposition of undue liability on classification societies could be harmful. Id. at 535. Specifically, "[t]he societies could be deterred by the prospect of liability from performing work on old or damaged vessels that most need their advice" and it "could diminish owners' sense of responsibility for vessel safety even as it complicates liability determinations."[3] Accordingly, the holding of Otto Candies was narrow, finding that Otto Candies was eligible to bring a negligent misrepresentation claim against NKK under the facts of that particular case "because NKK actually knew at the time it reclassified the SPEEDER that the results of the classification survey were to be conveyed to Otto Candies for the purpose of influencing its decision to purchase the SPEEDER."[4]Id. at 537.
Contrary to Appellants' argument, the scenario in Otto Candies is not analogous to the facts of this case, as the plaintiff in Otto Candies specifically requested and relied upon the survey and information provided by NKK, and used that information, a misrepresentation on the part of NKK, in its decision to purchase the vessel. Id. at 536. Additionally, NKK was aware[5] that Otto Candies would receive *404 NKK's report and use it to guide their decision to purchase the SPEEDER. Id.
Moreover, we do not find that Appellants established the necessary elements for a claim of negligent misrepresentation against ABS under these particular facts and circumstances. Appellants do not point to any evidence that ABS failed to exercise reasonable care in gathering the information contained in its survey report, nor does the record evidence a lack of such reasonable care. Similarly, the record does not reveal that any of the information contained in the survey is false. Additionally, we find no evidence in the record which demonstrates that any member of the crew relied upon or even read or saw the contents of the survey.[6] Because the record does not evidence that the crew relied on survey documents prepared by ABS, the fourth element is also not met (that the crewmembers suffered a pecuniary loss as a result of the reliance).[7] Finally, we find that Appellants failed to demonstrate that they are a part of the limited group of persons for whose benefit and guidance ABS either intended to supply the information or knew that Marika Maritime intended to supply it. See Otto Candies, supra. Accordingly, under the current status of federal jurisprudence, we are required to affirm the trial court's findings with respect to the American Bureau of Shipping.

THE SALVAGE ASSOCIATION AND PAUL FRANCIS DANIEL
In the fifth and final assignment of error, Appellants assert that the trial court erred in granting SA and Paul Francis Daniel's motion for summary judgment because genuine issues of material fact existed regarding reliance by the officers and crew on the survey performed by SA and Daniel.
While the M/V MARIKA was in Brazil, Paul Francis Daniel, a surveyor for The Salvage Association, conducted a condition survey for the hull underwriters on October 3, 1993. Mr. Daniel noted in the survey that the external shell plating was in good condition and that a considerable amount of new steel had been added in the forepeak and permanent ballast tanks. Mr. Daniel ultimately concluded in his October 14, 1993 report that the vessel's condition was satisfactory.
As discussed previously herein with respect to the necessary elements to establish a negligent representation claim, the record in this case does not reveal that any crewmember relied upon, read, or was otherwise aware of Daniel's conclusions in the survey. See Otto Candies, supra, at 535-36. The October 14, 1993 report was provided only to the vessel's owners and underwriters.[8] The record does not evidence that SA and Daniel provided the survey conclusions to the vessel's crew and officers, or that such conclusions were false or intended for their guidance and benefit. *405 See id.[9] As we noted previously herein regarding Appellants' allegations against ABS, under the current status of federal jurisprudence, we are similarly required to affirm the trial court's findings with respect to the Salvage Association and Paul Francis Daniel.

MOTIONS FOR SANCTIONS
In this case, counsel for MHI filed a Motion to Disqualify John M. O'Quinn and Charles B. Musslewhite, Jr. as Counsel of Record for Appellants, asserting that O'Quinn and Musslewhite were not members of the Louisiana State Bar, and emphasizing that no pro hac vice order had been entered by any court allowing O'Quinn and Musslewhite to appear in this matter. In response, counsel for Appellants filed a Motion for Sanctions Pursuant to La. C.C.P. art. 863, arguing that not only have attorneys O'Quinn and Musslewhite participated in the case sub judice since its inception, but also that a pro hac vice order, signed on May 22, 1995, admitting attorneys O'Quinn and Musslewhite in this matter exists in the record.
Counsel for Appellants seek sanctions pursuant to La. C.C.P. art. 863, which provides that an attorney who signs a pleading certifies:
... that he has read the pleading; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact; that it is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.
La. C.C.P. art. 863(B). Appellants further submit that La. C.C.P. art. 863(D) provides that sanctions be imposed for inaccurate certifications that are represented to the court:
If, upon motion of any party or upon its own motion, the court determines that a certification has been made in violation of the provisions of this Article, the court shall impose upon the person who made the certification or the represented party, or both, an appropriate sanction which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, including a reasonable attorney's fee.
La. C.C.P. art. 863(D). Additionally, counsel for Appellants asserts that the record in this case clearly shows that both attorneys O'Quinn and Musslewhite were admitted pro hac vice, citing to the order signed by Judge Connolly signed on May 22, 1995.
In response, counsel for MHI filed a motion to dismiss the motion for sanctions, arguing that attorneys O'Quinn and Musslewhite failed to seek pro hac vice admission at the appellate level, but conceding that the attorneys were in fact admitted pro hac vice at the district court level in the case in 1995. Counsel for MHI cites no authority, however, for its assertion that a motion to appear pro hac vice should have been filed with this Court.
Counsel for MHI cites Hampton v. Greenfield, which held that the ability to impose sanctions for an La. C.C.P. art. 863 violation is necessarily limited to the trial court because "[o]nly a trial court is capable of holding the required art. 863 hearing where evidence may be presented on the sanctions issue." Hampton, 618 So.2d 859, *406 862 (La.1993). The Court further held that the "court of appeal's authority to regulate conduct before it is governed by La.Code Civ.P. art. 2164, which provides in pertinent part that "`[t]he [appellate] court may award damages for frivolous appeal.'" Id. Accordingly, [b]y limiting the court of appeal's authority to awarding damages solely for frivolous appeals, art. 2164 places a logical limit on the application of art. 863 to matters before the trial court." Id. This Court followed Hampton in McCall v. McCall, 94-1614 (La.App. 4 Cir. 2/23/95), 651 So.2d 878, 887(emphasis added):
It is improper for this court to award sanctions pursuant to Louisiana Code of Civil Procedure Article 863. The authority to impose sanctions pursuant to article 863 is limited to the trial court. Hampton v. Greenfield, 618 So.2d 859 (La.1993). An appellate courts' authority to regulate conduct before it is governed by Louisiana Code of Civil Procedure Article 2164 which provides, in pertinent part, the court may award damages for frivolous appeal. Hampton, supra.
This court lacks authority to impose La. C.C.P. art. 863 sanctions. As such, we deny Appellants' Motion for Sanctions.

CONCLUSION
Accordingly, for the foregoing reasons, the trial court's judgment with respect to the Salvage Association, Ltd. and Paul Francis Daniel is affirmed. Likewise, the court's judgment granting the motion for summary judgment in favor of ABS is affirmed. Finally, the judgment granting MHI's motion to dismiss is also affirmed. Further, we deny Appellants' Motion for Sanctions.
AFFIRMED.
LOVE, J., concurs in part and dissents in part.
BELSOME, J., concurs in part and dissents in part and assigns reasons.
LOVE, J., concurs in part and dissents in part.
I respectfully dissent for the reasons assigned by Judge Belsome as it relates to dismissal pursuant to La. C.C.P. art. 1471. In all other respects, I concur with the majority.
BELSOME, J., concurs in part and dissents in part and assigns reasons.
All seamen aboard the M/V MARIKA perished when the vessel disappeared in a bitter North Atlantic winter storm. As a result of the majority's decision, the widows and orphaned children of the seamen aboard the M/V MARIKA will forever lose their day in court, without a scintilla of evidence that they knowingly and/or willfully violated a court order.
Although La.Code Civ. Proc. art. 1471 provides that dismissal is a remedy available to courts for a party's failure to comply with court-ordered discovery, the Louisiana Supreme Court has clarified that dismissal is a draconian penalty and is thus reserved for extreme circumstances and only the most culpable conduct. Horton v. McCary, 93-2315 (La.4/11/94), 635 So.2d 199, 203. In Horton, the Court noted that federal district courts consider four factors when evaluating whether a failure to comply with discovery mandates dismissal or default judgment:[1]

*407 (1) whether the violation was willful or resulted from inability to comply; (2) whether less drastic sanctions would be effective; (3) whether the violations prejudiced the opposing party's trial preparation; and (4) whether the client participated in the violation or simply misunderstood a court order or innocently hired a derelict attorney.
Horton, 635 So.2d at 203 (emphasis added). Accordingly, dismissal is generally appropriate when the client, as well as the attorney, is at fault, and the record must evidence that the failure was due to willfulness, bad faith, or fault of the noncompliant party. Id. Furthermore, this Court has repeatedly held that the ultimate sanction of dismissal should be imposed only when the noncompliant party is clearly aware that his failure to comply will result in dismissal. See, e.g., Medical Review Panel Proceedings of Peter v. Touro Infirmary, XXXX-XXXX, p. 5 (La.App. 4 Cir. 7/6/05), 913 So.2d 131, 134; LeBlanc v. GMAC Financial Services, 97-0131 (La. App. 4 Cir. 5/28/97), 695 So.2d 1106, 1108.
In this case, Appellees did not establish, nor did the majority find, that Appellants were clearly aware that failure to obtain the visas by a certain date would result in dismissal of their claims. By disregarding this critical fact, the majority expressly contradicts the law of this Circuit.
In this case, depositions were noticed[2] for July of 2003; however, the Filipino Appellants' visas to travel to the United States were ultimately denied under the Immigration and Nationality Act ("INA"). In an attempt to provide an alternative method to obtain Appellants' depositions, Appellants filed a Motion for Protective Order and to Order the Taking of Depositions by Video Teleconferencing in September 2004, asserting that the more stringent State Department restrictions after the events of September 11, 2001, prevented the Filipino claimants from obtaining visas, as all applications were denied in May 2003, and maintaining that Appellants were prepared and willing to go forward in the litigation. Notably, Appellees refused Appellants' offers to take the depositions via video conferencing. Appellees also refused an offer from Appellants to take the depositions in another country where Appellants could actually obtain visas, at counsel for Appellants' cost.
In August of 2006, MHI filed supplemental interrogatories and requests for production, requesting information regarding whether the applications for visas had been re-filed. Appellants' responses indicated that they had retained immigration counsel and a special investigator to assist with the securing of visas; that each visa applicant was interviewed in 2003 at the time of the application; and that no documents were returned or provided to Appellants subsequent to the interviews other than the denial letter. Affidavits from Mark S. Cross,[3] the immigration counsel, *408 and Rob Kimmons,[4] the special investigator, were attached to Appellants' responses and explained in detail the difficult and extensive process involved in obtaining visas for the plaintiffs.
Under these particular facts and circumstances, this writer would find that the trial court abused its discretion in dismissing Appellants' claims against MHI with prejudice for failure to appear in New Orleans for deposition, as the record does not evidence a refusal on the part of the Filipino plaintiffs themselves to travel to New Orleans or to obtain visas within the time constraints articulated by the trial court. See Horton, 635 So.2d at 203. Although Appellants failed to comply with the court-ordered discovery, like the clients in Horton, the record in this case does not reveal that such failure was due to willfulness, bad faith, or fault on the part of the Filipino plaintiffs themselves. See id. Rather, the delay in obtaining the visas was attributable to a multitude of obstacles, including litigation regarding forum non conveniens, two devastating natural disasters, and other forces beyond Appellants' control. Nor does the failure to comply with the court-ordered discovery appear to be due to any willfulness, bad faith, or fault of Appellants' counsel.[5]See id. Additionally, because the Filipino claimants could have been deposed by video conferencing, which Appellants offered but MHI refused, MHI's trial preparation was not prejudiced in this case. See id. Finally, less drastic sanctions would have been effective under these particular facts and circumstances. See id.
Therefore, pursuant to the standard articulated in Horton, supra, this writer would find that the Appellants' noncompliance in the case sub judice does not rise to such a level that necessitates a dismissal with prejudice.[6] This Court has repeatedly followed Horton for the proposition that only the most egregious conduct is reserved for the ultimate sanction of dismissal for failure to comply with court-ordered discovery. See, e.g., Raspanti v. Litchfield (La.App. 4 Cir. 11/21/06), 946 So.2d 234, 241 (quoting Horton's language regarding the fact that the dismissal of a complaint with prejudice "is the ultimate sanction for a plaintiff" and "should be imposed for failure to comply with a discovery order only as a last resort, and only after the litigant has been afforded the opportunity *409 to be heard"); Medical Review Panel Proceedings of Peter v. Touro Infirmary (La. App. 4 Cir. 7/6/05), 913 So.2d 131, 134 (refusal to comply with court ordered discovery is a serious matter pursuant to Horton, but ultimate sanction of dismissal is reserved as a last resort); Lane v. Kennan (La.App. 4 Cir. 4/27/05), 901 So.2d 630, 632 (citing Horton's four-factor test to consider before taking "drastic action" of dismissal); Smith v. 4938 Prytania Inc. (La.App. 4 Cir. 1/26/05), 895 So.2d 65, 70 (acknowledging Horton's holding that "the extreme sanction of dismissal was almost never to be imposed"); Barber v. Ichaso (La.App. 4 Cir. 2/27/02), 811 So.2d 1128, 1132 (citing Horton's four-factor test); LeBlanc v. GMAC Financial Services (La. App. 4 Cir. 5/28/97), 695 So.2d 1106, 1108 (citing Horton and recognizing that dismissal is the ultimate sanction for a litigant; that dismissal should only be imposed as a last resort; and that dismissal should be imposed only after the litigant is afforded an opportunity to be heard).
Notably, this principle was also articulated by this Court in Columbia Homestead Ass'n v. Arnoult, 615 So.2d 1, 3 (La.App. 4 Cir.1992)(internal citations omitted)(emphasis added):
These [discovery] sanctions should be imposed for failure to comply with a discovery order only as a last resort and only after an opportunity to be heard has been afforded the litigant. Moreover, the record must show that the party was clearly aware that his noncompliance would result in the sanction and show that the party himself, and not merely his attorney, was at fault in failing to comply with the discovery order. The record must establish that the noncompliance was due to the "willfulness, bad faith or fault" of the party himself as opposed to his counsel. If the record does not contain evidence that the noncompliance was attributable to the party's fault, the court has abused the wide discretion afforded it by LSA-C.C.P. art. 1471.
The majority distinguishes Columbia Homestead and its progeny only by a passing reference to the particular facts of this case, thereby disregarding the law of this Circuit.
Clearly, the plaintiffs' deposition testimony cannot offer any enlightenment regarding liability; rather, the principal reason for deposing the widows and orphans in this case is to document the survival action, essentially how much they love and miss their deceased husbands and fathers. The matter should have been remanded with instructions to the trial court to conduct a hearing to determine whether the clients themselves failed to respond to the court-ordered discovery. Horton, 635 So.2d at 203-04; Columbia Homestead, 615 So.2d at 3. If the court determined that sanctions were warranted, such sanctions should not extend to a dismissal with prejudice, and should be directed only to counsel, as opposed to the widows and children. See Horton, 635 So.2d at 204.
For the foregoing reasons, I respectfully dissent from the majority's affirmation of the motion for summary judgment granted in favor of MHI. Additionally, I dissent from the majority's denial of counsel for Appellants' motions for sanctions. While this Court has no authority to rule on such sanctions pursuant to Hampton v. Greenfield, 618 So.2d 859 (La.1993), the sanctions were nonetheless filed in this Court. The matter should be thus be remanded to the trial court to determine what, if any, sanctions against counsel for MHI are warranted.
In all other respects, I concur with the majority.

*410 ON REHEARING GRANTED
ROLAND L. BELSOME, Judge.
Plaintiffs-Appellants appeal the trial court's judgment dismissing their claims against all Defendants-Appellees and denying their motion for new trial. This Court's prior opinion affirmed the matter in its entirety. Upon rehearing, we reverse the portion of the trial court's judgment which dismissed the Appellants' claims against Appellee Mitsubishi Heavy Industries, and remand the matter for proceedings consistent with this opinion.

FACTS AND PROCEDURAL HISTORY
Plaintiffs-Appellants ("Appellants") are relatives and personal representatives of Greek and Filipino seamen who were aboard the M/V MARIKA on January 1, 1994. On that date, the vessel disappeared in a North Atlantic winter storm while in international waters en route from Canada to the Netherlands.[1] Neither the vessel nor any crewmembers were ever recovered. Suit was filed in Orleans Parish on October 13, 1994, against Mitsubishi Heavy Industries ("MHI"), the company who constructed the vessel; the American Bureau of Shipping ("ABS"), the surveyors who certified that the vessel was seaworthy after repairs in Greece in April 1993; and The Salvage Association, Ltd. ("SA") and Paul Francis Daniel ("Daniel"), the surveyors who, in conjunction with the vessel's hull insurance policy, performed a survey in Brazil in October 1993 and concluded that the vessel's condition was satisfactory.
The litigation was interrupted at various times due to the events of September 11, 2001; litigation involving forum non conveniens, the aftermath of Hurricane Katrina in 2005, Typhoon Durian in the Philippines in 2006,[2] and the arduous process of obtaining visas for the Filipino plaintiffs to travel to the United States for deposition purposes.
On July 30, 2007, SA and Paul Francis Daniel filed a motion for summary judgment. The trial court granted Daniel and SA's motion for summary judgment on October 3, 2007, as well as a motion for summary judgment filed by ABS. That same date, the trial court also granted a motion to dismiss the Filipino plaintiffs that had been filed by MHI on June 28, 2007. Appellants' motion for new trial was denied on October 16, 2007. On November 15, 2007, the trial court issued written reasons for each of the three judgments. This appeal followed.
On June 3, 2009, this Court affirmed the trial court's dismissal of all Defendants-Appellants. Cantuba v. American Bureau of Shipping and Mitsubishi Heavy Industries, Ltd., XXXX-XXXX (La.App. 4 Cir. 6/3/09), 31 So.3d 397, 2009 WL 1564474. On August 10, 2009, rehearing was granted, ordering the matter reset for oral argument on November 17, 2009.

STANDARD OF REVIEW
An appellate court generally reviews a judgment granting dismissal under the abuse of discretion standard. Ridgeway v. Pierre, XXXX-XXXX, p. 4 (La.App. 4 Cir. 1/11/07), 950 So.2d 884, 888. Appellate courts review summary judgments de novo while applying the same criteria applied by trial courts to determine whether summary judgment is appropriate. Huber v. Liberty Mut. Ins. Co., XXXX-XXXX, p. 5 (La. App. 4 Cir. 2/7/01), 780 So.2d 551, 554.

*411 DISCUSSION
We find that the trial court erred in dismissing Appellants' claims with prejudice against MHI pursuant to La.Code Civ. Proc. art. 1471 and in denying Appellants' motion for new trial.
In this case, the Filipino appellants were ordered by the trial court on February 2, 2000 to appear in New Orleans for deposition. Depositions were noticed[3] for July of 2003; however, the Filipino Appellants' visas to travel to the United States were denied under the Immigration and Nationality Act ("INA"). In September 2004, Appellants filed a Motion for Protective Order and to Order the Taking of Depositions by Video Teleconferencing, asserting that the more stringent State Department restrictions after the events of September 11, 2001, prevented the Filipino claimants from obtaining visas, as all applications were denied in May 2003. Maintaining that Appellants were ready and willing to go forward in the litigation, Appellants proposed the video conferencing as an alternative to the efforts to bring the Filipino claimants to New Orleans for deposition. Appellants further argued that their good faith effort to comply with the court's order to conduct the depositions in New Orleans was evidenced by the fact that the Greek claimants were brought to New Orleans for deposition in 2003.
On October 24, 2004, MHI filed a Cross-Motion to Dismiss the Claims of All Non-Appearing Plaintiffs Ordered on February 2, 2000 to Appear in New Orleans for Depositions. Appellants' opposition asserted that despite the efforts to obtain the visas for the Filipino plaintiffs from the U.S. Embassy in Manila as soon as the forum non conveniens litigation was resolved, all applications were denied. Appellants further argued that Appellees refused Appellants' offers to take the depositions via video conferencing or to take the depositions in another country where Appellants could obtain visas, at counsel for Appellants' cost. After hearing arguments, the trial court signed a judgment dated February 4, 2005, denying Appellees' motion for summary judgment, MHI's cross-motion to dismiss, and Appellants' motion for protective order. The trial court further ordered the Filipino plaintiffs to re-apply for visas to travel to the United States at the U.S. Embassy in Manila, Republic of Philippines, and to notify the court if the reapplication was unsuccessful so that a status conference could be scheduled.
In August of 2006, MHI filed supplemental interrogatories and requests for production, requesting information regarding whether the applications for visas had been re-filed.[4] Appellants' responses on December 6, 2006 indicated that they had retained immigration counsel and a special investigator to assist with the securing of visas; that each visa applicant was interviewed in 2003 at the time of the application; and that no documents were returned or provided to Appellants subsequent to the interviews other than the denial letter. Affidavits from Mark S. Cross,[5] the immigration counsel, and Rob *412 Kimmons,[6] the special investigator, were attached to Appellants' responses.
MHI filed a second Motion to Dismiss in June 2007, arguing that Appellants had failed to comply with the court ordered discovery and made no genuine effort to obtain visas to travel to the U.S. After hearing arguments, the trial court granted MHI's motion to dismiss. Appellants filed a motion for new trial, arguing that a few months after the court's order to re-apply for visas, Hurricane Katrina struck, necessitating temporary relocation of Appellants' counsel's office to Houston, Texas; that although counsel for Appellants was in the process of contacting claimants for re-application in 2006, Typhoon Durian caused communications between claimants and counsel to come to a standstill; and that the claimants successfully submitted the re-applications for visas on July 14, 2007 and were granted interviews for same on October 16, 2007, by the U.S. Embassy in Manila. As previously noted, however, Appellants' motion for new trial was denied.
MHI argues that Appellants have repeatedly failed to comply with courtordered discovery by failing to secure visas and allow for the deposition of the Filipino appellants. Thus, MHI argues, the trial court appropriately granted their motion to dismiss pursuant to La.Code Civ. Proc. art. 1471 because Appellants failed to demonstrate that the noncompliance with discovery orders was justified. Conversely, Appellants maintain that the delays in securing visas were not due to lack of diligence or good faith, and that the remedy of dismissal was too harsh and contrary to Louisiana jurisprudence.
Article 1471 provides, in pertinent part:
If a party ... fails to obey an order to provide or permit discovery ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
(3) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.
La.Code Civ. Proc. art. 1471.
Although the statute provides that dismissal is a remedy available to courts for a party's failure to comply with court-ordered discovery, the Louisiana Supreme Court has acknowledged that dismissal is a draconian penalty and is thus reserved for extreme circumstances and only the most culpable conduct. Horton v. McCary, 93-2315 (La.4/11/94), 635 So.2d 199, 203. In Horton, the Court noted that federal district courts consider four factors when evaluating whether a failure to comply with discovery mandates dismissal or default judgment:[7]

*413 (1) whether the violation was willful or resulted from inability to comply; (2) whether less drastic sanctions would be effective; (3) whether the violations prejudiced the opposing party's trial preparation; and (4) whether the client participated in the violation or simply misunderstood a court order or innocently hired a derelict attorney.
Horton, 635 So.2d at 203. Dismissal is generally appropriate when the client, as well as the attorney, is at fault, and the record must evidence that the failure was due to willfulness, bad faith, or fault of the noncompliant party. Id. Furthermore, this Court has held that the ultimate sanction of dismissal should be imposed only when the noncompliant party is clearly aware that his failure to comply will result in dismissal. See Medical Review Panel Proceedings of Peter v. Touro Infirmary, XXXX-XXXX, p. 5 (La.App. 4 Cir. 7/6/05), 913 So.2d 131, 134; LeBlanc v. GMAC Financial Services, 97-0131 (La.App. 4 Cir. 5/28/97), 695 So.2d 1106, 1108.
Appellants argue that the delay in securing visas was not due to any willfulness, bad faith or fault, but rather a result of forces beyond their control and legitimate obstacles in obtaining visas for the Filipino plaintiffs. Additionally, Appellants submit that the record does not evidence any willful misconduct, bad faith or personal fault on the part of the Filipino claimants themselves, and that the record contains information justifying the claimants' inability to travel to New Orleans for deposition. Moreover, Appellants argue that the record does not evidence that the Filipino plaintiffs were aware that their unsuccessful attempts to secure visas could result in dismissal of their claims.
Under these particular facts and circumstances, we find that the trial court abused its discretion in dismissing Appellants' claims against MHI with prejudice for failure to appear in New Orleans for deposition. We do not find that the record evidences a refusal on the part of the Filipino plaintiffs themselves to travel to New Orleans. See Horton, supra, at 203. Moreover, although Appellants plainly failed to comply with the court-ordered discovery, like the clients in Horton, the record in this case does not reveal that such failure was due to willfulness, bad faith, or fault on the part of the Filipino plaintiffs, but rather to natural disasters and other factors beyond Appellants' control. See id. Nor do we find that the failure to comply with the court-ordered discovery was due to willfulness, bad faith, or fault of Appellants' counsel. See id. Additionally, because the Filipino claimants could be deposed by video conferencing, which Appellants offered but MHI refused, we do not find that MHI's trial preparation was prejudiced in this case. See id. Finally, less drastic sanctions would have been effective under these particular facts and circumstances. See id.
Therefore, pursuant to the standard articulated in Horton,[8] the Appellants' non-compliance *414 in the case sub judice does not rise to such a level that necessitates a dismissal with prejudice.[9] Accordingly, we reverse and remand the trial court's judgment with respect to MHI.
The noncompliance in this case, however, is not without consequence. This Court finds that sanctions are plainly warranted against counsel for Appellants pursuant to La. C.C.P. art. 1473,[10] which provides *415 that if a party fails to appear for a properly noticed deposition, the court shall require payment of an adverse party's reasonable expenses, including attorney's fees, either by the party failing to act, or his attorney, or both. La. C.C.P. art. 1473.
Notably, the Louisiana Supreme Court has upheld the assessment of costs and attorney's fees pursuant to La. C.C.P. art. 1473 resulting from discovery failures that were not the fault of the plaintiff himself. Allen v. Smith, 390 So.2d 1300, 1302 (La. 1980). In Allen, the Court recognized that "it [was] not clear to what extent, if any, the plaintiff, rather than the attorney advising him, was at fault for failing to make discovery." Id. As such, the Court found that the trial court abused its discretion in "imposing the ultimate sanction of dismissal with prejudice; the record does not support a finding that the failure was due to the plaintiff's willfulness, bad faith, or fault." Id. The Court concluded that "[b]ecause the record contains no evidence that the plaintiff was personally at fault," but that the failure to provide discovery was ostensibly the result of the inattention of his counsel, counsel for plaintiff alone was obligated to pay costs and attorney's fees. Id.
In this case, the record does not evidence that Appellants themselves exhibited any willfulness or bad faith in the failure to appear for the depositions. Accordingly, like the plaintiff in Allen, Appellants herein should not be subject to the draconian penalty of dismissal. See id. The matter is hereby remanded to the trial court for the imposition of sanctions against counsel for Appellants pursuant to La. C.C.P. art. 1473 and for the determination of the amount of same.

CONCLUSION
The portion of the trial court's judgment granting MHI's motion to dismiss is reversed and the matter remanded for proceedings consistent with this opinion. The matter is hereby remanded to the trial court for imposition of sanctions against counsel for Appellants and determination of the amount of same pursuant to La. C.C.P. art. 1473. In all other respects, this Court's opinion remains unchanged.
REVERSED IN PART ON REHEARING; REMANDED.
GORBATY, J., dissents with reasons.
I respectfully dissent. La. C.C.P. art. 1471 provides in pertinent part:
If a party ... fails to obey an order to provide or permit discovery ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
(3) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.
Trial courts in Louisiana have broad discretion when regulating pre-trial discovery. This discretion will not be disturbed on appeal absent a clear showing of abuse. Moak v. Illinois Cent. R. Co., 93-0783 (La.1/14/94), 631 So.2d 401. In Hutchinson v. Westport Insurance Corp., XXXX-XXXX *416 (La.11/8/04), 886 So.2d 438, the Supreme Court recognized that a trial court has much discretion in imposing sanctions on litigants for failure to comply with discovery orders, and noted, "Although dismissal is a harsh remedy, this case is deserving of a harsh remedy, as these tactics and delays frustrate the judicial system." Id. at 440.
Plaintiffs state that they could not comply with discovery orders because of Hurricane Katrina, post-9/11 travel restrictions, and Typhoon Durian (a catastrophic typhoon in the Philippines). Many plaintiffs lived in remote areas of the Philippines, further slowing the process of reapplying for visas. Plaintiffs point out that Mr. Musslewhite, plaintiffs' counsel, traveled to Manila in order to participate in the visa application process to the extent allowed.
The Filipino plaintiffs violated court orders to appear in New Orleans for deposition multiple times. The Filipino plaintiffs filed suits in Civil District Court for the Parish of Orleans in 1994. In February 2000, they were ordered by the trial court to appear in New Orleans for depositions. None of the plaintiffs appeared, nor was the court advised that they would not appear. In 2005, MHI filed a motion to dismiss. Plaintiffs responded that they were unable to obtain a visa to travel to New Orleans. In February 2005, the court denied that motion, but ordered plaintiffs to reapply for a visa at the U.S. Embassy in Manila. If that application was unsuccessful, plaintiffs were to notify the court so that a status conference could be scheduled.
In August 2006, MHI obtained permission from the court to file Supplemental Interrogatories and Requests for Production of Documents to the Filipino plaintiffs in an effort to learn whether they had reapplied for visas as ordered by the court. No answer was received, and a Motion to Compel was filed. The responses eventually received in December 2006 indicated that plaintiffs had done nothing and had failed to reapply for visas at the U.S. Embassy.
Plaintiffs did not attempt to reapply for visas until after MHI filed its second Motion to Dismiss on June 28, 2007. MHI introduced the affidavits of immigration attorney/expert, Mark Murov, who stated that the efforts by plaintiffs and their counsel to procure visas were "woefully inadequate" even by minimum standards that any layperson could easily have learned. Plaintiff offered no affidavit or other evidence that would excuse their inaction and noncompliance with the trial court's orders.
This case illustrates a complete refusal of the litigants and their attorneys to comply with the orders of the trial court. The trial court properly dismissed the claims because its orders were flouted, defied and ignored for 8 years. Plaintiffs disregarded the order to reapply for visas for two and a half years, and made no effort to reapply for visas until after the defendants moved to dismiss plaintiffs' suits. Plaintiffs were aware of the need to travel to the United States for depositions, but repeatedly failed to take steps to do so.
Under these specific circumstances, the trial court did not abuse its broad discretion. Here, the plaintiffs' repeated and egregious failure to comply with orders over a period of several years justifies the remedy imposed. Accordingly, for these reasons, I would affirm this matter in its entirety.
NOTES
[1] ABS conducts surveys to verify that a vessel is "in class." ABS' classification of a vessel certifies that the vessel complies with ABS Rules.
[2] The ABS surveyor noted the following deficiencies that had to be remedied before ABS could classify the vessel:

... damaged and wasted overhead spool piping sections that connect the cooling system machinery to the hull; a hull fracture in the port-aft main-engine exhaust connection to the hull; fractured hull brackets, wasted cooling piping, leaks in the port and starboard stabilizer fins; excessive movement in the starboard stabilizer shaft; leaks in the port-forward main-engine sea strainer that filters the water used to cool the engines; disconnected and missing bilge pumps; gas and water leaks in the exhaust system; a faulty circuit breaker for the starboard generator; severe damage to the port-aft main propulsion gear; exterior and interior leaks in the main reduction gear oil coolers; damage to the starboard-forward main engine; damage and deterioration in the ventilation system for the port-aft engine; corroded hose and pipe connections for the main and auxiliary engine fuel and lube oil systems that created a severe fire hazard; leaking water-jet pump shaft seals; a heavily corroded port and starboard water-jet pump-bladder accumulator-block valve; and that the engine oil was sooty, black, and contained particulate matter which suggested problems with the machinery.
Otto Candies, supra, at 532-33.
[3] The court further noted:

Ultimately, broader imposition of liability upon classification societies would increase their risk management costs and rebound in higher fees charged to the societies' clients throughout the maritime industry. Whether such risk-spreading is cost-efficient in an industry with well-developed legal duties and insurance requirements is doubtful. The distinctions articulated in caselaw to date recognize the care with which claims against classification societies must be studied.
Otto Candies, supra, at 535.
[4] In so doing, the court held that "in this context, we reject any implication that classification societies can be liable for negligent misrepresentation to parties, including without limitation seamen, longshoremen, passengers, cargo owners, and charterers that may rely upon a survey or class certificate, absent actual knowledge by the classification society that the certificate or survey report was being provided for the guidance and benefit of the party." Otto Candies, supra, at 537.
[5] The district court admitted into evidence written correspondence from James Aitkenhead, a ship broker, to Otto Candies directly supporting the court's findings. Aitkenhead's communications reveal that NKK was aware of the pending sale of the ship; that NKK's reclassification of the SPEEDER free of recommendations was a condition of the agreement under which the SPEEDER was to be sold; and that Otto Candies' purchase of the SPEEDER would be based on NKK's classification of the ship free of recommendations.

Otto Candies, supra at 536.
[6] Although Captain Ioannides was present while the vessel was being repaired, there is no evidence demonstrating that he saw the survey documents that ABS provided to the MARIKA's owner or that he relied upon the documents in any way. Additionally, we find Appellants' reliance on Captain Ioannides' wife's hearsay testimony to be misplaced, as her testimony establishes only that she was erroneously under the impression that ABS guaranteed the M/V MARIKA's seaworthiness.
[7] Notably, the Otto Candies court further held: "[t]he fact that it is merely foreseeable or possible that a non-client of the [surveyor] would rely on the information is insufficient [to establish a negligent misrepresentation claim]." Otto Candies, 346 F.3d at 535.
[8] Appellants do not dispute this fact, but argue that the issue is whether the officers and crew knew about the survey and relied upon it.
[9] For the reasons discussed with regard to Appellants' claims against ABS, we also find that the fact that the Master and Chief Engineer were present during Daniel's inspection does not operate to impute reliance upon or knowledge of the contents of the survey.
[1] The Court recognized that La.Code Civ. Proc. art. 1471 is similar to Federal Rule 37, as both contain a provision for dismissal or default judgment for failure to comply with court-ordered discovery. Horton, 635 So.2d at 203.
[2] Correspondence dated May 6, 2003 from counsel for Appellants to counsel for Appellees requested that counsel for Appellees serve Appellants with notices of deposition, as the U.S. Embassy in the Philippines required proof of the necessity of Appellants' travel to the United States.
[3] Mr. Cross, a former Consular Officer, detailed, inter alia, the incredibly vast discretion that is afforded the Consular Officer in approving or denying visa applications; and that despite having a legitimate reason to travel to the United States (such as a court order), the applicant would also need to satisfy the Consular Officer that he or she has significant and specific personal ties to the Philippines that would effectively force them to return after traveling to the U.S. Mr. Cross further affirmed that each additional application after having previously been denied a visa would likely be increasingly difficult.
[4] Mr. Kimmons stated that civil unrest and terrorist activities hampered travel by any person to the Philippines. Mr. Kimmons further affirmed that Typhoon Durian devastated the Philippines in November 2006 as Hurricane Katrina devastated New Orleans, displacing many residents, causing infrastructural damage and a "state of calamity" as declared by Philippine President Gloria Macapagal Arroyo, thereby slowing the progress of communications within the Philippines.
[5] The Greek claimants involved in this litigation were brought to New Orleans for deposition in 2003, further evidencing Appellants' good faith effort to comply with the court's order to conduct depositions in New Orleans.
[6] Notably, this Court, in Smith v. 4938 Prytania, Inc., supra, at p. 10-11, 895 So.2d at 71, discussed Benware v. Means, wherein the Louisiana Supreme Court articulated the extreme type of behavior for which severe sanctions are warranted:

In the Benware [v. Means, 99-1410 (La.1/19/00), 752 So.2d 841] case the Supreme Court found that the trial court judge had not abused his discretion in prohibiting the defendant from offering any evidence at trial, because drastic sanctions were appropriate where the defendant was an attorney representing himself in a legal malpractice action where it was "virtually undisputed" that he had committed malpractice. The Benware case was "precisely the `rare' case" that the Supreme Court had "contemplated as appropriate for the imposition of the harshest penalty." 99-1410, p. 11, 752 So.2d at 848.
[1] The record reveals that the winter storm produced winds between 46 and 58 miles per hour; gusts of 63 miles per hour; 30-foot waves and swells of 32 to 42 feet.
[2] See infra note 6.
[3] Correspondence dated May 6, 2003 from counsel for Appellants to counsel for Appellees requested that counsel for Appellees serve Appellants with notices of deposition, as the U.S. Embassy in the Philippines required proof of the necessity of Appellants' travel to the United States.
[4] MHI's motion to compel responses to this discovery was granted by the trial court.
[5] Mr. Cross, a former Consular Officer, detailed, inter alia, the incredibly vast discretion that is afforded the Consular Officer in approving or denying visa applications; and that despite having a legitimate reason to travel to the United States (such as a court order), the applicant would also need to satisfy the Consular Officer that he or she has significant and specific personal ties to the Philippines that would effectively force them to return after traveling to the U.S. Mr. Cross further affirmed that each additional application after having previously been denied a visa would likely be increasingly difficult.
[6] Mr. Kimmons stated that civil unrest and terrorist activities hampered travel by any person to the Philippines. Mr. Kimmons further affirmed that Typhoon Durian devastated the Philippines in November 2006 as Hurricane Katrina devastated New Orleans, displacing many residents, causing infrastructural damage and a "state of calamity" as declared by Philippine President Gloria Macapagal Arroyo, thereby slowing the progress of communications within the Philippines.
[7] The Court recognized that La.Code Civ. Proc. art. 1471 is similar to Federal Rule 37, as both contain a provision for dismissal or default judgment for failure to comply with court-ordered discovery. Horton, 635 So.2d at 203.
[8] This Court has repeatedly followed Horton for the proposition that only the most egregious conduct is reserved for the ultimate sanction of dismissal for failure to comply with court-ordered discovery. See, e.g., Raspanti v. Litchfield (La.App. 4 Cir. 11/21/06), 946 So.2d 234, 241 (quoting Horton's language regarding the fact that the dismissal of a complaint with prejudice "is the ultimate sanction for a plaintiff" and "should be imposed for failure to comply with a discovery order only as a last resort, and only after the litigant has been afforded the opportunity to be heard"); Medical Review Panel Proceedings of Peter v. Touro Infirmary (La.App. 4 Cir. 7/6/05), 913 So.2d 131, 134 (refusal to comply with court ordered discovery is a serious matter pursuant to Horton, but ultimate sanction of dismissal is reserved as a last resort); Lane v. Kennan (La.App. 4 Cir. 4/27/05), 901 So.2d 630, 632 (citing Horton's four-factor test to consider before taking "drastic action" of dismissal); Smith v. 4938 Prytania Inc. (La.App. 4 Cir. 1/26/05), 895 So.2d 65, 70 (acknowledging Horton's holding that "the extreme sanction of dismissal was almost never to be imposed"); Barber v. Ichaso (La.App. 4 Cir. 2/27/02), 811 So.2d 1128, 1132 (citing Horton's four-factor test); LeBlanc v. GMAC Financial Services (La.App. 4 Cir. 5/28/97), 695 So.2d 1106, 1108 (citing Horton and recognizing that dismissal is the ultimate sanction for a litigant, that dismissal should only be imposed as a last resort, and only after the litigant is afforded an opportunity to be heard).

Notably, this principle was also recognized by this Court prior to Horton in Columbia Homestead Ass'n v. Arnoult, 615 So.2d 1 (La. App. 4 Cir.1992)(emphasis added)(internal citations omitted):
These [discovery] sanctions should be imposed for failure to comply with a discovery order only as a last resort and only after an opportunity to be heard has been afforded the litigant. Moreover, the record must show that the party was clearly aware that his noncompliance would result in the sanction and show that the party himself, and not merely his attorney, was at fault in failing to comply with the discovery order. The record must establish that the noncompliance was due to the "willfulness, bad faith or fault" of the party himself as opposed to his counsel. If the record does not contain evidence that the noncompliance was attributable to the party's fault, the court has abused the wide discretion afforded it by LSA-C.C.P. art. 1471.
[9] This Court, in Smith v. 4938 Prytania, Inc., supra, at p. 10-11, 895 So.2d at 71, discussed Benware v. Means, wherein the Louisiana Supreme Court articulated the type of behavior for which severe sanctions were warranted:

In the Benware [v. Means, 99-1410 (La.1/19/00), 752 So.2d 841] case the Supreme Court found that the trial court judge had not abused his discretion in prohibiting the defendant from offering any evidence at trial, because drastic sanctions were appropriate where the defendant was an attorney representing himself in a legal malpractice action where it was "virtually undisputed" that he had committed malpractice. The Benware case was "precisely the `rare' case" that the Supreme Court had "contemplated as appropriate for the imposition of the harshest penalty." 99-1410, p. 11, 752 So.2d at 848.
Likewise, the facts and circumstances of the instant case are plainly distinguishable from this Court's decision in At Your Service Enterprises, Inc. v. Swope, where the Appellant not only repeatedly violated orders to provide discovery and a consent judgment executed in open court, but also failed to appear on the date of trial, and again failed to appear in court on his own motion for a new trial. Swope, XXXX-XXXX, pp. 9-10 (La.App. 4 Cir. 1/14/09), 4 So.3d 138, 144-45. Accordingly, in Swope, dismissal was mandated pursuant to La. C.C.P. art. 1672(A)(1)(providing that "[a] judgment dismissing an action shall be rendered upon application of any party, when the plaintiff fails to appear on the day set for trial"). Id.
[10] If a party or an officer, director, or managing agent of a party or a person designated under Articles 1442 or 1448 to testify on behalf of a party fails to appear before the officer who is to take his deposition, after being served with a proper notice, or to serve answers or objections to interrogatories submitted under Article 1457, after proper service of the interrogatories, or to serve a written response to a request for inspection submitted under Article 1461, after proper service of the request, the court in which the action is pending on motion may make such orders in regard to the failure as are just, and among others it may take any action authorized under Paragraphs (1), (2), and (3) of Article 1471. In lieu of any order or in addition thereto, the court shall require the party failing to act or the attorney advising him or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

The failure to act described in this Article may not be excused on the ground that the discovery sought is objectionable unless the party failing to act has applied for a protective order as provided by Article 1426.
La. C.C.P. art. 1473 (emphasis added).